Carl Clifford CRAFTON

v.

Mark H. LUTTRELL, Commissioner of Correction, State of Tennessee, et al.

Calvin MURRY, Individually and on behalf of all other State Penitentiary inmates similarly situated

v.

Winfield DUNN, Governor, State of Tennessee, and Mark H. Luttrell, Commissioner of Correction, State of Tennessee.

Civ. A. Nos. 6615 and 6795.

United States District Court, M. D. Tennessee, Nashville Division.

Sept. 13, 1973.

As Amended June 25, 1974.

Stephen C. Small, Nashville, Tenn., for plaintiffs.

W. Henry Haile, Asst. Atty. Gen. of Tenn., Nashville, Tenn., for defendants.

## MEMORANDUM

MORTON, District Judge.

This is a class action by all inmates of the Tennessee Department of Correction seeking declaratory and injunctive relief pursuant to the Civil Rights Act, 42 U. S.C. § 1983. Principal defendants are the Governor and the Commissioner of Correction of the State of Tennessee, and the Warden of the Tennessee State Penitentiary, Nashville, Tennessee. Jurisdiction of the court is acquired pursuant to 28 U.S.C. §§ 1343(3) and 2201.

Plaintiffs allege the absence of procedural due process in the administration of prison disciplinary measures, and more specifically, that confinement in administrative segregation, forfeiture of good and honor time, and revocation of parole and work release status have and are being accomplished without affording inmates their right to due process of law.

### I.

There have been in recent years an increasing number of civil rights suits filed by state and federal prison inmates against those charged with their custody. A percentage of these cases filed in this court are thinly-veiled attempts to circumvent the exhaustion requirement of 28 U.S.C. § 2254 in what are plainly habeas corpus situations. Another segment of these complaints filed pursuant to 42 U.S.C. § 1983 allege, as is true in the instant case, the denial of procedural

due process in disciplinary hearings in which the sanction imposed is the loss of good and honor time credits and/or removal from good and honor time accrual status. Whether these too are cases properly cognizable only as petitions for habeas corpus is a question considered subsequently in this opinion. A further element of this litigation concerns the constitutionality of conditions of confinement. Finally, and frequently an adjunct of the condition of confinement cases, are those which allege lack of procedural due process in the imposition of segregated or solitary confinement as a disciplinary measure, regardless of whether the conditions of that confinement are assailed as being unconstitutional in and of themselves.

■ Traditionally, there has existed a general reluctance among federal courts to interfere with the internal operation of state prisons, including the nature of disciplinary measures employed by prison administrators. More recently, however, the trend has been away from this "hands off" doctrine, and the courts, while remaining reticent to assume any type of general supervisory control, have at least begun to review the constitutionality of the administration of prison discipline. This has been especially true since the Supreme Court's decision in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), held that termination of a welfare recipient's benefits without prior notice and hearing was constitutionally impermissible as a denial of due process under the Fourteenth Amendment. The sweep of this decision has been broad indeed, and not the least affected area has been that of procedural due process behind prison walls. Numerous district courts have considered this problem in light of *Goldberg,* and although there may have been no consensus reached as to what procedural safeguards must precede the imposition of prison discipline, there certainly remains no serious doubt that due process applies and that suits alleging its denial are val- ·

id sources of judicial inquiry under 42 U.S.C. § 1983.

## II.

This case first arose with the June 16, 1972, filing of the *pro se* "Petition for Injunctive Relief and Declaratory Judgment" of Carl Clifford Crafton, an inmate at the Tennessee State Penitentiary, Nashville, Tennessee. Crafton's claim was under 42 U.S.C. § 1983, and alleged the complete absence of any semblance of due process in the disciplinary hearing which resulted in his loss of one year's good and honor time and his commitment to administrative segregation.

This disciplinary action was taken in January, 1972, as a result of Crafton's having forced a prison nurse to inject him with a narcotic while he held another prison employee hostage. Following the incident, Crafton claims that he was locked in isolation for 30 hours before meeting a disciplinary board, and that at his hearing, prior to which he was given no notice of the precise charges, he was not allowed to make a statement in his own behalf, was not allowed to present witnesses of his own, and was not permitted to confront or cross-examine the witnesses against him nor the guards charging the rule violation. The disciplinary board voted to take twelve months accrued good and honor time from Crafton, and committed him to administrative segregation where he remained for approximately eight months. Crafton further alleges that he was never charged with the violation of another prison rule during this eight-month period, although such a length of confinement was expressly prohibited by disciplinary regulations.

On the basis of the allegations, a law firm was appointed to represent Crafton, and the cause was set for hearing. Prior to the hearing the parties, on September 6, 1972, entered into a consent order (Appendix A) in which it was agreed that the disciplinary board procedures, Section 4.600 et seq. of the Manual of Adult Service Policies and Proce-

dures for the Department of Correction (hereinafter the "Manual"), failed to meet certain requirements of due process of law. The consent order provided that any prisoner accused of a rules violation would have certain rights, which in summary were:

(1) written notice of the rule violated and the manner of its violation no less than six hours prior to meeting a disciplinary committee;

(2) the right of confrontation and cross-examination of an accusing witness or guard;

(3) the right to call one inmate witness on behalf of the accused, with additional inmate witnesses callable within the discretion of the disciplinary board;

(4) the right to an inmate counsel-substitute to assist the accused in investigating the facts and to appear with him at the hearing;

(5) the opportunity for the accused to present a defense and to offer any facts and circumstances which might warrant mitigation of any punishment to be imposed; and

(6) the right not to be retained in isolation for investigation or suspicion of rules violation longer than eighteen hours without the written charge being counter-signed by the warden or deputy warden that probable cause exists to suspect the charged inmate with the alleged infraction.

It was further provided in the order that defendants would be permanently enjoined from placing any prisoner in administrative or punitive segregation in excess of sixty days for the violation of any prison rule.

Following the entry of the September 6, 1972, consent order in the *Crafton* case, this court received an unusually large number of *pro se* complaints from other prisoners within the Tennessee correctional system, primarily from the Tennessee State Penitentiary in Nashville, Tennessee. For the most part, these complaints came from inmates who claimed loss of good and honor time and/or commitment to administrative segregation under alleged circumstances similar to those which gave rise to the *Crafton* order. The complaints depicted situations occurring both before and after September 6, 1972, in which it was alleged by some prisoners that in disciplinary proceedings they had not been afforded the rights required by the September 6 order, by others that these rights were not constitutionally adequate, and by numerous others that they were being unlawfully held in administrative segregation longer than the sixty-day maximum set by the September 6 order. The relief sought was an injunction restoring lost good and honor time and/or release from administrative segregation.

On November 9, 1972, the defendants filed a motion to modify the September 6 decree so as to delete the following:

"[Defendants] are hereby permanently enjoined from placing any prisoner in administrative or punitive segregation in excess of sixty days for the violation of any prison rule."

Then, on November 29, 1972, Calvin Murry, also an inmate at Tennessee State Penitentiary, filed a civil rights class action alleging, as did Crafton, denial of due process in the forfeiture of good and honor time, and in addition that confinement in administrative or punitive segregation, revocation of work release status, and rescission of parole recommendations had occurred without a hearing that comported with due process. As in the suit by Crafton, the complaint sought declaratory and injunctive relief.

Murry had been sentenced to 5 to 10 years for robbery in 1970, and by December, 1971, had been placed on educational release. During the early period of his confinement, Murry had been involved in several incidents which resulted in disciplinary action against him, but due to his improved discipline and good performance while on educational release, was recommended for parole by

the Board of Probation and Paroles on January 27, 1972, and was scheduled for parole on October 4, 1972. Then, on February 15, 1972, Murry was placed on the work release program and employed by a firm which would be his employer while on parole.

On March 24, 1972, Murry was charged with forging a check, and was summarily removed from work release and placed in segregation. On the basis of this charge and the recommendation of the Director of Rehabilitative Services, the defendant Commissioner, without a hearing, revoked six months of Murry's good and honor time on April 6, 1972. On August 17, 1972, Murry's parole recommendation was rescinded, apparently on the basis of the March 24 check forgery charge. Although some sort of hearing preceded this action, which was termed by plaintiff as an "informal hearing," the procedures employed at the hearing are not in the record. Murry went before the disciplinary committee on several other occasions for violation of various prison regulations, was made to forfeit additional good and honor time, and remained in administrative segregation most of the time between September 3, 1972, and the date of the initial hearing before this court on March 30, 1973.

By order of December 12, 1972, the application for a temporary restraining order in the *Murry* case was denied, the case was certified as a class action, and due to the similar questions of fact and law involved, was consolidated for hearing with the *Crafton* case, in which was pending the motion to modify the September 6 order. The decision in this consolidated action will in turn dispose of the similar issues raised in the other complaints filed subsequent to September 6, 1972, by prisoners who became members of the class composed of every individual in the actual or constructive custody of the Tennessee Department of Correction.

Pending the scheduled hearing in this case, the defendants by consent agreed to a limited grant of relief to those prisoners who would, through having forfeited good and honor time in proceedings which might ultimately be found to be constitutionally infirm, suffer unlawful imprisonment beyond the date at which they would otherwise have been released from prison. In general, this relief required defendants to act in any one of three ways as appropriate to each prisoner's case: release from prison on or before December 24, 1972, restoration of good and honor time, or release on the day the prisoner would have been released but for the forfeiture of good and honor time, unless prior to that day the prisoner received a hearing which complied with the procedural safeguards outlined in the September 6, 1972, order.

### III.

■ The initial question to be resolved in this case is whether the procedural rights adopted on September 6, 1972, by consent of the parties in Crafton v. Luttrell,[1] afford prisoners facing disciplinary action due process of law. The constitutional adequacy of these procedures is not to be measured by the requirements of a criminal prosecution, for the full panoply of procedural due process rights do not apply to the administration of prison discipline. *See, e. g.,* Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970); Kritsky v. McGinnis, 313 F.Supp. 1247, 1250 (N.D.N.Y.1970). In now familiar language of Goldberg v. Kelly, *supra,* may be found the appropriate line of inquiry in assessing the scope of due process in matters of prison discipline.

"The extent to which procedural due process must be afforded [an individual] is influenced by the extent to which he may be 'condemned to suffer grievous loss,' Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 647, 95 L.Ed.

1. Civil No. 6615 (M.D.Tenn., September 6, 1972).

817, 851 (1951) (Frankfurter, J., concurring), and depends upon whether the [individual's] interest in avoiding that loss outweighs the governmental interest in summary ·adjudication. Accordingly, as we said in Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–1749, 6 L.Ed.2d 1230, [1236] (1961), 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' See also Hannah v. Larche, 363 U.S. 420, 440, 442, 80 S.Ct. 1502, 1513, 1514, 4 L.Ed.2d 1307, [1320, 1321] (1960)." Goldberg v. Kelly, *supra*, at 262, 263.

In the case before it, the *Goldberg* Court characterized the loss of welfare benefits "grievous," and found that due process demands that a welfare recipient be afforded a pre-termination hearing. However, the Court found that countervailing state interests, such as speedy resolution of questions of welfare eligibility, warranted limiting the pre-termination hearing to "minimum" procedural safeguards which were declared to be timely and adequate notice, a hearing before an impartial tribunal, the right to present evidence orally, confrontation and cross-examination of adverse witnesses, the right to retain counsel, a decision based solely on evidence adduced at the hearing, and a statement of the reasons for the decisionmaker's determination and the evidence relied upon. *Id.*, at 267–271.

■ Although the Supreme Court has yet to apply *Goldberg* in the prison context, this court is in accord with those numerous lower federal courts which have held that comparable minimum procedural safeguards apply to prison disciplinary hearings in which the punishment imposed represents a "grievous loss" to the prisoner. *See, e. g.*, Krause v. Schmidt, 341 F.Supp. 1001 (W.D. Wis.1972); Landman v. Royster, 333 F.

Supp. 621 (E.D.Va.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal. 1971); Sostre v. Rockefeller, 312 F. Supp. 863 (S.D.N.Y.1970), aff'd., modified and rev'd. in part sub-nom Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971).

### IV.

Appearing as witnesses in the hearing of the instant case were Crafton, Murry, three other inmates from the Tennessee State Penitentiary, Robert Morford, Deputy Warden of the institution, and Charles Bass, Deputy Commissioner of Correction for the State of Tennessee. The testimony of these witnesses concerned principally two subjects: the conduct of disciplinary proceedings at the prison, and the nature and conditions of disciplinary segregation, both "administrative" and "punitive." In terms of *Goldberg*, these subjects are interrelated, for the extent to which defendants' disciplinary measures impose .a "grievous loss" prescribes, in large part, the due process safeguards which must accompany their imposition.

The actions which may be taken by a disciplinary board against an inmate found guilty of a rule violation are set forth in Sec. 4.600 of the Manual. Of these measures, only commitment to punitive and administrative segregation, and recommended loss of good and honor time are at issue in this case. In addition, removal from work release and rescission of parole recommendation are disciplinary measures available to other agencies within the Tennessee correctional system. The nature of these sanctions is hereinafter examined as a preliminary step to determining whether existing procedural safeguards are compatible with the minimum requirements of due process.

*Punitive Segregation*

According to Sec. 4.601 of the Manual, punitive segregation is designed to:

". . . provide a place of temporary maximum custody for rule breakers in the institution, as well as to protect the order and security of the

institution. Normally, punitive segregation is effected when the infraction of rules is too serious to justify a mere reprimand."

The essential purpose, then, is discipline. To this end, rule violators are isolated in solitary confinement from the general prison population, and are made to sacrifice certain privileges and opportunities available to other inmates.

The punitive segregation cells receive adequate ventilation and lighting, and contain a washbowl, toilet, and bedding consisting of a mattress and two blankets. According to prison policy, inmates in punitive segregation receive the regular prison diet, and are permitted to bathe and shave daily. Prisoners going into punitive segregation carry with them only their clothing; and other conveniences such as television, radio, tobacco, books or other personal belongings are not allowed during this period of detention. Necessary toiletries are available, but must be returned to the guards after use. These prisoners do retain mail and visitation rights, but all other privileges such as use of the commissary, the opportunity to work, and the chance to exercise are lost, and the only times a prisoner is allowed outside his cell is for medical reasons and for interviews requested by the counseling staff. Prison regulations provide that periods of punitive segregation cannot exceed five days for commission of minor offenses or thirty days for commission of major offenses.[2] No showing has been made that in actual practice periods of punitive confinement exceed these limits.

No contention has been made by plaintiffs in this lawsuit that the above described conditions of punitive segregation constitute cruel and unusual punishment. While these conditions might be cruel and unusual if endured indefinitely, the court likewise finds no basis for such a characterization in view of the fact that such conditions exist for at most thirty days at a time. Certainly, it has not been shown that currently existing conditions at the Tennessee State Penitentiary, in punitive segregation or elsewhere, even remotely resemble those previously found and condemned in Hancock v. Avery, 301 F.Supp. 786 (M.D. Tenn.1969).

■ Even so, the court recognizes that prison life is often a harsh and undesirable existence, which by design compels individuals unwilling to conform to society's law to relinquish certain freedoms and privileges which that law protects. In the prison context, additional losses of remaining comforts or opportunities, which to those outside might seem minor, are major deprivations in a prisoner's world. So, while the conditions of punitive segregation are not unconstitutional, the court finds that they nevertheless are of such a "grievous" nature as to require that adequate procedural safeguards precede their imposition.

*Administrative Segregation*

"The purpose of administrative segregation is to provide a place of temporary maximum custody to protect an individual, others, and to promote and maintain order. Administrative segregation is recommended for those men with serious problems of maladjustment, mental illness, or sexual abnormality to the degree that their safety or the safety of others is threatened in their normal day-to-day status."

By the terms of the above excerpt from the Manual, Sec. 4.601, administrative segregation is not designed as a punitive measure, and is used not for rule violators but as a means of insulating a certain inmate or the general prison population from future violations. In essence, administrative segregation is

---

2. Examples of major offenses are assault, escape or attempted escape, possession or use of drugs, sexual malpractice, participation in a riot, creating a disturbance, and refusal to work. Offenses generally considered minor are "horseplay," gambling, and being out of place. Certain offenses, such as cursing an official, possession of contraband, and destruction of property may be considered either major or minor.

characterized as a security device employable by the disciplinary board to promote the general welfare of the institution.

As a practical matter, the court finds that administrative segregation is utilized in many instances as a disciplinary measure for an inmate's violation of a specific prison rule. Sec. 4.600 of the Manual specifies, in part, that "[t]he Disciplinary Board will decide what course of discipline, if any, the inmate will have to undergo as a result of his violation of institutional regulations." The same section goes on to provide that administrative segregation among others is a course of action available to the disciplinary board. Moreover, the proof in this case reveals that on numerous occasions the disciplinary board has recommended that an inmate not only be administratively segregated but also that accrued good and honor time be forfeited. This latter sanction is clearly punishment which in no way resembles a custodial measure designed "to protect an individual, others, and to promote and maintain order," and simultaneous use of these two measures lends credence to the court's conclusion that administrative segregation is frequently employed as punishment for a prisoner's violation of prison rules. Nevertheless, the relevant constitutional inquiry is not whether a measure is characterized as "punishment" or "for the welfare of the institution," but rather what effect the measure has on the liberty of the prisoner involved. Regardless of how labeled, if commitment to administrative segregation constitutes a grievous loss, then minimum procedural safeguards are called into play.

Administrative segregation cells at the main prison are apparently the same size and type as those used for punitive segregation, and no issue is raised herein that living conditions in these cells violate Eighth Amendment standards. The basic thrust of plaintiffs' position is that the curtailment of generally available privileges and prolonged periods of isolated confinement render commitment to administrative segregation a loss to which *Goldberg* due process standards apply.

As was true for punitive segregation, confinement in administrative segregation results in the loss of certain rights and opportunities. These deprivations are not, however, as substantial as in the case of punitive segregation. Deputy Warden Morford testified that inmates in administrative segregation are permitted their full range of personal belongings, but are not allowed to possess any type of malleable metal objects nor any glass, except for that in a television set. So, with the exception of glass and metal objects, which are apparently withheld for reasons of security and inmate safety, inmates in administrative segregation have available in their cells the same bedding, clothing, personal belongings and conveniences as are available to prisoners in the general population.

A common element of punitive and administrative segregation is that inmates are housed in cells by themselves. Other inmates cannot be seen from within a cell, but conversation between cells apparently is possible. In addition to living in a cell by himself, an inmate in administrative segregation sustains other consequences as a result of his isolated status. He cannot attend movies or other recreational activities; he cannot work; he must eat his meals in his cell; he cannot go to the prison commissary; he cannot attend regular sick call; and he cannot exercise with the general population. In general, the daily routine of these prisoners is structured to minimize contact with other inmates.

The regular prison diet is served in three daily meals, but salt is the only condiment permitted. Medical treatment is available, but rather than inmates attending sick call, a medical technician comes by the administrative segregation cells each morning and receives prisoner medical problems. Medicine may then be sent back to the cell, or in more serious cases the prisoner will be taken to the prison hospital. With the

exception of the restricted items, commissary supplies are brought to the administrative segregation unit and may be purchased there by the inmates. Since possession of glass is prohibited, products normally sold in glass containers must be purchased in single-serving packages wrapped in cellophane. As would be expected, items such as coffee, for instance, are more expensive when purchased in this manner, and since they cannot work and earn wages, inmates in administrative segregation not only may pay higher prices than prisoners not so confined, but also they have less to spend.

Unlike those in punitive segregation, prisoners in administrative segregation are allowed out of their cells to exercise, and as of the date of the trial, the exercise yard provided for these inmates was an area of approximately 50 feet by 25 feet bordered by concrete block walls 15 feet high topped with barbed wire. This area is completely bare, and contains no recreational or other apparatus with which to exercise. Thus, unless an inmate performs calisthenics, "exercise" periods in this yard amount to a chance to walk around in the outside air and be exposed to available sunlight.

As a rule, prisoners are exercised in groups of about 15 to 20 inmates, although there generally exist a number of inmates who are required to exercise alone. This group is composed of those individuals, such as former police officers, members of prison factions, or others, who the administration considers of danger to others or who would be in danger themselves if placed in close proximity to other inmates. At the time of trial, 22 prisoners, out of an approximate administrative segregation population of 75 to 110, were in this group.

Morford testified that, whether individually or in groups, prisoners had been allowed out to exercise approximately twice a week for thirty minutes each time. Plaintiffs disputed this figure, and claimed that some prisoners have been exercised as infrequently as once every three weeks. The court is not inclined to accept plaintiffs' claim as a true reflection of defendants' actual practice in regard to exercise, although the evidence does indicate that there have been occasional departures from Morford's stated policy. In some of these instances, it is possible that certain inmates have refused to participate in exercise periods; in others, inmates may well have been denied exercise periods as additional punishment or as a means of harassment by guards.

Since the conclusion of the trial of the case, defendants have filed with the court pictures of a new outside exercise area constructed for administrative segregation residents which went into operation on June 12, 1973. This area is 50 feet by 131 feet bordered by a chain link fence topped with barbed wire, and contains basketball goals and a volleyball net. By affidavit, Warden James H. Rose states that with this added facility, administrative segregation inmates are now given the opportunity to exercise from 45 minutes to one hour each day, except when it is raining. It does appear, however, that those inmates who are exercised individually have access only to the smaller, less desirable area formerly used by all residents of administrative segregation. Regardless of in which location, in this discussion the court assumes that defendants shall continue to provide regular exercise periods for administratively confined prisoners, and that prison administrators will insure that no prisoner is denied this opportunity.

In reference to personal hygiene, each cell in administrative segregation is equipped with a normal toilet, and a lavatory with hot and cold running water. Morford testified that inmates in segregation are given an opportunity to shower twice weekly, but he did not state whether the same applies to shaving. Presumably, inmates may shave at least twice a week, during the periods in which they are allowed to shower. Inmate testimony differed on this point too, with one witness stating that during his 57-day confinement in adminis-

trative segregation in early 1973, he was given only one opportunity to shower and was never allowed to shave. Furthermore, this prisoner testified that during his almost two-month isolation he was never given a change of clothing.

The above described consequences of administrative segregation must be considered within a time context, for the length of time during which prison authorities confine an inmate under such conditions directly relates to the severity of the deprivation and hence to the procedural rights of prisoners being considered for such confinement. As previously described, confinement in punitive segregation cannot exceed thirty days according to prison policy, and by terms of the September 6 order, neither punitive nor administrative may exceed sixty days for the violation of any prison rule.

Moreover, the permissible length of a prisoner's administrative segregation is at issue in this case since defendants seek to modify that portion of the September 6 order which limited both punitive and administrative segregation to no more than sixty days, so as to permit longer administrative segregation when, in the opinion of the warden, such is necessary for the protection of an inmate or the security of the institution. Defendants have interpreted the 60-day limit of the September 6 order as applicable only to inmates confined for violation of prison rules. And, since in theory rules violators are committed only to punitive segregation, defendants have confined and are continuing to confine in administrative segregation for longer periods prisoners considered to be either security risks or in personal danger, but who have not necessarily been charged with the violation of a specific prison rule.

In urging the need for greater flexibility in fixing periods of administrative segregation, defendants point out that in an institution the size of Tennessee State Penitentiary, with an approximate population of 2000 men, there inevitably exist individuals who require segrega-

tion due to their inability or unwillingness to adjust to prison society. Some of these inmates are prone to perpetrate violent acts against other residents, and others, for various reasons, become themselves the objects of physical attack. Defendants contend that since these inmates would pose a hazard to the safety and security of the institution if permitted to dwell in the general population, they need separate confinement. And, since the problems requiring segregation cannot uniformly be corrected within a pre-determined time, defendants argue that the durational limit of administrative segregation cannot reasonably be set at sixty days. Further, defendants apparently take the position that administrative segregation must, in some cases, be for a potentially indefinite period in order for it to be an efficacious administrative tool.

Plaintiffs, on the other hand, vigorously oppose the requested modification of the September 6 order, and defendants' continuing policy of administratively segregating certain prisoners much longer than sixty days has emerged as a central dispute between the parties in this case. The pertinent question in resolving this matter is whether the Constitution sets a limit on the length of time a prison inmate may be held under conditions of solitary confinement. While administrative segregation in defendants' institutions is not truly "solitary," the court finds that the extent of isolation from other prisoners is sufficiently complete to justify treating it as such for purposes of the constitutional inquiry in this case. In determining what the Constitution does or does not require, this court's concept of what may constitute the most enlightened or rehabilitatively productive methods of prison discipline is quite irrelevant.

■ It is well established that solitary confinement is not per se constitutionally impermissible. Sostre v. McGinnis, *supra*; Burns v. Swenson, *supra*; Courtney v. Bishop, 409 F.2d 1185 (8th Cir. 1969), cert. denied 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192

(1969). However, the Constitution does proscribe, for even brief periods, confinement which is "cruel and unusual." The standard for determining what conduct contravenes this Eighth Amendment prohibition has been variously expressed; e. g., "the wanton infliction of pain," Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463, 67 S.Ct. 374, 91 L.Ed. 422 (1947); that which "shocks the most fundamental instincts of civilized man," *id.* at 473 (dissenting opinion); punishment which violates the "evolving standards of decency that mark the progress of a maturing society," Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958); when punishment is "of such a character . . . as to shock general conscience or to be intolerable to fundamental fairness," Lee v. Tahash, 352 F.2d 970, 972 (8th Cir. 1965). In addition, it is clear that "a punishment may be cruel and unusual when, although applied in pursuit of a legitimate penal aim, it goes beyond what is necessary to achieve that aim; that is, when a punishment is unnecessarily cruel in view of the purpose for which it is used. Weems v. United States, [217 U.S. 349, 370, 30 S.Ct. 544, 54 L.Ed. 793 (1910)]. . . . ." Jordan v. Fitzharris, 257 F.Supp. 674, 679 (N.D.Cal.1966).

■ Applying these standards to the instant case, the court is unable to conclude, under the conditions which have been shown to exist, that the Eighth Amendment forbids administrative segregation for an indeterminate period which may, in some instances, exceed sixty days. In view of this, the court has no basis on which to specify to defendants that no prisoner within their custody may, for any reason, be administratively segregated for longer than sixty days. In reaching this decision, the court has considered the diet in administrative segregation, the provisions for personal hygiene, the availability of books, other reading matter, radio, television, the opportunity to exercise, the possibility of communication with other segregated inmates, and the opportunity,

in most cases, to associate with other segregated prisoners during daily exercise periods. While the court does recognize that life in administrative segregation is less desirable than in the general prison population, the court does not find that the rigors of this confinement are such as to render its use for periods longer than sixty days violative of the Eighth Amendment. It is also apparent to the court from prisoner records on file in this case that administrative segregation is not per se unreasonably harsh in relation to the purpose for which it has been used. Weems v. United States, *supra.*

It may be useful in reference to the above holding to emphasize that the court has *not held* that the disciplinary board may, after considering a prisoner's past rule violations, his attitude, and his threat to prison security, "sentence" him to perpetual confinement in administrative segregation for the duration of his sentence. In all likelihood such a scheme would exceed permissible punishment under the Eighth Amendment. What has been held today is that prison authorities may administratively segregate a prisoner for an unspecified period when, in their opinion, that prisoner's activities or attitude pose an existing threat to prison security and welfare.

■ This ruling contemplates some type of periodic review in which the disciplinary board re-evaluates the prisoner's need for continued segregation, and provision for that review was made in the September 6, 1972, order entered in this case. The relevant portion of that order provided that:

"... any prisoner held in administrative or punitive segregation in excess of thirty days shall have his case reviewed *no less than weekly so that he may present facts and circumstances tending to mitigate the sentence imposed.*" (Emphasis supplied.)

Defendants should not view this as a perfunctory obligation, and, especially in light of today's clarification of the permissible length of administrative segre-

gation, they must take positive steps to insure that prisoners held in administrative segregation longer than thirty days receive a meaningful weekly review.

From the evidence it appears that defendants are conducting actual review hearings at which the prisoner is present only every thirty days. However, defendants contend that segregation confinees do receive weekly, or more frequent, review in the sense of the near daily observations and interviews conducted by personnel of the counseling staff. Without knowing more, the court questions whether this procedure affords inmates the weekly opportunity, as required by the above-quoted provision of the September 6 order, to "present facts and circumstances tending to mitigate the sentence imposed." At the same time, the court does not find that this provision requires that prisoners receive a formal weekly hearing before a disciplinary board. Moreover, it is likely that formal hearings of such frequency would soon degenerate into the summary proceedings of the type sought to be avoided.

Therefore, it should be sufficient to satisfy both the letter and the intent of the review requirement if there occurs at least weekly an informal process in which segregated inmates are afforded, as part of their observation, a chance to speak with a counselor and offer facts and circumstances in support of their release from segregation. Then, as is apparently the current practice, each confinee must receive each thirty days an actual hearing before the disciplinary board in which he may be present and given a reasonable opportunity to air his views. In order that the weekly counselor observations form an integral part of the overall reviewing process, the opportunity should always exist for a counselor to recommend to the disciplinary board that it consider a certain prisoner for return to the general prison population prior to his regularly scheduled hearing.

In the court's opinion, the review hearing should not be adversary in nature, and the reviewing board should consider all relevant facts and circumstances, particularly the weekly evaluations of the inmate's counselor. Furthermore, those inmates who have been segregated as a result of emotional or personality aberrations short of requiring their transfer to mental institutions should be given every opportunity to consult with available psychiatrists or psychologists, and the observations of these specialists should be available to and considered by the reviewing board. In short, an inmate facing administrative segregation should know not only the reasons for his segregation, but also that his situation and adjustment will be reviewed regularly with the goal being his return to the general prison population.

The court has found that administrative segregation, as described *supra*, represents a measure which may be legitimately employed by state prison authorities in exercising their governmental function of preserving order and discipline within the prison system. In terms of the procedures which due process requires, the court has set forth the nature of the private interest affected by such governmental action, Cafeteria & Restaurant Workers Union, etc. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), by describing the consequences to a prisoner of his segregated confinement. The court finds that commitment to administrative segregation constitutes a substantial loss of prisoner liberty, and that this loss may, in some instances, exceed the "grievous loss" resulting from punitive segregation confinement. For, in the court's opinion, a stay of some extended period, such as ninety days, in administrative segregation may well constitute a greater deprivation than would the much shorter thirty-day period in punitive segregation. Since in either case the loss to the confined prisoner may be grievous, the court holds that every pris-

oner appearing before the disciplinary board who may be committed to administrative or punitive segregation shall be afforded rights consonant with the minimum requirements of due process.

The court desires to make it clear at this point, however, that nothing in this opinion or in the September 6 order should be construed as preventing the prison authorities, pending commencement of disciplinary proceedings, from immediately segregating any inmate whose continued presence in the general population might endanger the inmate himself, other inmates, or otherwise disrupt the orderly functioning of the prison in general. However, as per the September 6 order, written notice of charges must still be given and the inmate may not be retained in administrative segregation longer than eighteen hours without certification by the warden or acting deputy warden that probable cause exists to suspect the inmate of the alleged rules infraction. Furthermore, any prisoner so confined will be afforded, along with his inmate-counsel, a reasonable opportunity to prepare a defense to the charges.

### Work Release Programs

In 1970, the State of Tennessee established work release programs as a means of rehabilitative treatment whereby certain first and second-term inmates are permitted to leave correctional institutions to engage in approved work within the state. While on work release, inmates are domiciled under minimum security conditions at supervised confinement facilities near their jobs, and are able to enjoy liberty and rehabilitative opportunity unknown in the prison world from which they came. Participation in the work release program appears to be, with the exception of parole, the most favorable status attainable by one under the custody of the Tennessee Department of Correction.

As outlined earlier, Calvin Murry, after receiving recommendation for parole on January 27, 1972, was placed on work release on February 15, 1972. On March 24, 1972, he was removed from the program after allegedly stealing and cashing checks belonging to a co-worker. It is undisputed that following the alleged incident, Murry, without notice or hearing, was summarily removed from the work release program and transferred back to prison where he was placed on administrative segregation pending possible state prosecution. As a result of this incident, on the recommendation of the Director of Rehabilitative Services and without a hearing, defendant Commissioner revoked six months of good and honor time on April 6, 1972. Then, in August, 1972, the Division of Probation and Paroles, acting largely on the basis of his removal from work release, rescinded Murry's parole recommendation. At no time during the above sequence of events was Murry allowed an opportunity to contest his guilt, and to the best of the court's knowledge, neither the disciplinary board nor a similar group within the work release program ever conducted any type of formal proceeding in which the factual basis of Murry's charge was considered.

Given the nature of the work release and its desirable benefits, in terms of both liberty and rehabilitation, the court finds it inescapable that Murry's interest in avoiding loss of these benefits clearly outweighed any interest of the state in summarily removing him from the program. Furthermore, it hardly seems to require explication that the previously described manner of the state's summary adjudication of Murry's case did not comport with the due process requirements of the Constitution. The state apparently concedes this, and the court notes that since Murry's removal, the Director of Rehabilitative Services for the state has made provision that inmates charged with work release violations shall be afforded a disciplinary hearing in which the inmate is given an opportunity to plead his case. However, the record does not disclose the exact nature of this hearing, although it is apparently held before a

committee composed of a member of the work release security staff, one work-releasee, and a counselor, superintendent or other person designated by the work release center.

■ Because of the magnitude of the loss experienced by an inmate upon his removal from a work release assignment, the court holds that the hearing appropriate to the nature of that loss, *see* Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), must include the same procedural safeguards required prior to an inmate's confinement in punitive or administrative segregation. And these procedures apply regardless of the fact that work release may be deemed a "privilege," for the "relevant constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a 'right' or a 'privilege.'" Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971). This principle has found recognition in the prison context. Gray v. Creamer, 465 F.2d 179, 185 (3rd Cir. 1972); Sostre v. McGinnis, *supra*, at 196; Landman v. Royster, *supra*, at 644, 645; Carothers v. Follette, 314 F.Supp. 1014, 1027 (S.D.N.Y.1970).

*Good and Honor Time*

Of crucial concern to a large number of inmates represented in this action is the means by which they have been made to forfeit good and honor time credits.[3] In fact, a review of the prisoner complaints filed in this court pursuant to the *Crafton* consent order of September 6, 1972, reveals that loss of accumulated good and honor time is, with the possible exception of commitment to segregated confinement, the disciplinary measure for which procedural safeguards are most earnestly sought by plaintiffs herein.

■ Until very recently most of the lower federal courts routinely entertained under 42 U.S.C. § 1983 prisoner suits for restoration of good time credits, at least insofar as that claim arose from challenged disciplinary procedures that also resulted in additional deprivations such as assignment to segregated confinement. But the Supreme Court in Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), has now made it clear that suits seeking restoration of good time credits which were allegedly taken unlawfully are outside the scope of § 1983 and must be brought under the habeas corpus statute, 28 U.S.C. § 2254. In essence, when a prisoner is made to forfeit good time credit, the duration of his sentence is thereby lengthened. And, by the terms of *Preiser*,

"... when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate or more speedy release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Id.*, 411 U.S. at 499.

■ Furthermore, by the holding in *Preiser*, a claim of improperly cancelled good time credit is outside the scope of § 1983 not only when brought alone, but also when, as in the instant case, conditions of confinement and disciplinary procedures are under attack in the same suit. *Id.*, 411 U.S. at 499, n. 14.

■ Therefore, the court is without jurisdiction in this proceeding to consider the allegations pertaining to forfeiture of good and honor time, for this is a habeas corpus matter in which available state remedies must first be exhausted. The situation thus presented is somewhat anomalous, for the court can consider under § 1983 the legality of

---

3. Pursuant to T.C.A. § 41–332 et seq., a convict may receive credits against his sentence of up to four months per year served as a good behavior allowance, and of two months per year as an honor grade allowance. Prisoners who maintain a good con-duct record accrue these credits automatically, but the Commissioner of Correction is empowered under T.C.A. § 41–335 to impose forfeitures of accrued good and honor time as a penalty for rules violations.

procedures employed in confining an inmate to segregation, but cannot do so when the result is loss of good and honor time even though the procedures followed in either instance may have been identical.

*Revocation of Parole Recommendation*

In conjunction with the suit brought by Murry, plaintiffs contend that the State's rescission, without hearing, of an inmate's parole recommendation violates the Due Process Clause of the Fourteenth Amendment. In making this contention, plaintiffs rely heavily upon the due process requirements of Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), which held that the minimum requirements of due process apply to parole revocation, as well as the "grievous loss" test of Goldberg v. Kelly, *supra.*

Defendants contend that since Murry never actually achieved parole status, he never acquired that valuable, although qualified degree of liberty which *Morrissey* found to be protected by the Fourteenth Amendment. Rather, defendants argue that at the time of his parole recommendation rescission, Murry had, at most, an expectancy of freedom, and that the rescission occurred before the final parole decision had been made by the Board of Probation and Paroles. Therefore, it is asserted that Murry's case falls within the well-established rule that the requirements of procedural due process do not apply to the selection process through which inmates are considered and chosen for parole. *See, e. g.,* Menechino v. Oswald, 430 F.2d 403 (2d Cir. 1970).

Even were the court to agree that procedural due process applies in this situation, matters concerning the parole process are just as much the subject of habeas corpus as *Preiser* found good and honor time questions to be. Therefore, upon the same rationale set forth in the preceding discussion of good and honor time revocations, the court cannot, in this proceeding under 42 U.S.C. § 1983, adjudicate the merits of plaintiffs' claims arising out of the rescission of a recommendation for parole.

## V.

Turning now to the constitutional adequacy of the existing procedural safeguards, the September 6 order requires, in substance, that a prisoner accused of a rules violation be afforded, (a) timely and adequate written notice of charges; (b) a hearing at which he may be present; (c) the right to assistance of an inmate counsel-substitute; (d) the opportunity to confront and cross-examine adverse witnesses; (e) the right to introduce evidence and present at least one witness of his own; and (f) the right to make a statement in his own behalf. See Appendix A hereto. Measured against the previously described guidelines of Goldberg v. Kelly, *supra,* the court finds that on its face, the September 6 order is constitutionally deficient in failing to require that the disciplinary board be composed so as to be an impartial decisionmaker, that the board's decision be based solely upon evidence adduced at the hearing, and that the board render a written statement of the reasons for its decision and the evidence relied upon.

Rudimentary due process contemplates at the very least that the decisionmaker will be impartial. Goldberg v. Kelly, *supra,* at 271; Escalera v. New York City Housing Authority, 425 F.2d 853, 863 (2d Cir. 1970). This requirement prohibits any official from ruling on a case in which he has knowledge of any material fact, prior involvement, or personal interest in the outcome. Although there were allegations to the contrary, the court finds from the evidence that defendants have structured disciplinary boards so as to be impartial, notwithstanding lack of this requirement in the September 6 order.

Plaintiffs in this case have made a most forceful argument in favor of this court's requiring that an individual independent of the prison administration be made a part of the disciplinary com-

mittee. In fact, a significant amount of both prisoner testimony and oral argument of counsel was directed at showing that the presence of an independent hearing officer on the disciplinary board would insure not only that disciplinary proceedings would, in practice, accord with due process of law, but also that prisoners, out of a greater respect for prison justice, would more willingly accept punishment and tend towards more acceptable norms of behavior.

In support of this proposition, plaintiffs cite several decisions in which, as a part of evolving notions of due process in the prison context, prescribed relief has included provision for a hearing officer of this nature. Batchelder v. Geary, No. C–17–2017 RFP (N.D.Cal., April 16, 1973); Collins v. Schoonfield, 344 F.Supp. 257 (D.Md.1972);[4] Bundy v. Cannon, 328 F.Supp. 165 (D.Md. 1971).

Deputy Warden Morford agreed in his testimony that prisoners might be more satisfied with disciplinary measures imposed by a board containing a member completely independent of the prison administration, but he did not agree that such a person is either needed or desirable. Morford defended the good-faith operation of the disciplinary board as it is presently staffed, and stated his opinion that prisoners, particularly those faced with disciplinary action, are unwilling to accept that the institution does endeavor to deal fairly with its inmates. Further, Morford was of the opinion that persons from within the institution are better qualified by virtue of corrections knowledge and experience to deal meaningfully with inmate discipline problems than would be an outsider with no knowledge of prison affairs. In this sense, Morford felt that the administration of disciplinary measures by an outsider, even acting with the best of intentions, would not be in the best long-run interests of the prison population.

This court concurs with plaintiffs that an independent party, whether a member of the local bar or other person from the community, would be a desirable addition to most if not all prison disciplinary bodies. Moreover, in those cases in which the proof clearly reveals that prison administrators arbitrarily impose discipline without due regard for the rights of prisoners, and manifest an unwillingness to conform to the standards of due process of law, then an independent voice in the internal matters of prison discipline may be not only desirable but mandatory.

However, despite the possible desirability of an independent hearing officer in this case, the court does not find that such is constitutionally required within the due process framework.[5] As a part of the procedures necessary to insure the existence of at least minimum due process, each prisoner is entitled to have his or her "guilt" or "innocence" of rules infractions rationally found by a fair and impartial tribunal. Goldberg v. Kelly, *supra.* From the proof in this record, the court is unable to conclude that defendants are unwilling to discipline in accordance with due process, or that through current procedures, as supplemented by this opinion, they will be unable to do so. To the contrary, the court is convinced, not only by the testimony in this case, but also through a spirit of cooperation in-others, that defendants are both willing and dedicated to the fair administration of prison justice. They recognize, perhaps more fully than the court, that arbitrary and capricious treatment of prisoners is at odds with the goal of prisoner rehabilitation—a goal to which, in the court's estimation, defendants are

---

4. The interim decree required by *Collins* made provision for an independent hearing officer.

5. Neither Goldberg v. Kelly, *supra,* nor Morrissey v. Brewer, *supra,* precluded welfare or parole officers from participating as decision makers in hearings involving their respective programs. The only requirement was lack of involvement in the case under consideration.

committed. What may be needed, and what may have been lacking in the past, is closer supervision by prison administrators of lower echelon prison employees who, to a large degree, actually make up the disciplinary boards.

The second constitutional shortcoming of the September 6 procedures is the lack of a requirement that decisions be based solely upon evidence adduced at the hearing. "Fundamental to due process is that the ultimate decision be based upon evidence presented at the hearing, which the prisoner has the opportunity to refute." Landman v. Royster, *supra*, at 653, citing Goldberg v. Kelly, *supra*. The court finds that this procedure has been followed in hearings in which punitive segregation was the punishment to be imposed upon a finding of guilt. However, when a prisoner is considered for administrative segregation, i. e., when a specific rule may not have been violated, a possible variance from this requirement may have occurred since the disciplinary board reviews a prisoner's entire prison record prior to reaching a decision on whether to segregate him, and if so, for how long. The potential problem involves whether the prisoner is allowed to hear what facets of his past record are being considered by the board. The record is silent on this point. Since the extent of a prisoner's disruptive propensities reasonably relates to the length of his administrative segregation, the court finds no fault with defendants' practice of reviewing a prisoner's past prison record as a part of its decision-making process. However, since his record thus becomes evidence which influences the decision to punish, the inmate should therefore be present to hear and challenge the factors being considered by the board. The prisoner need not be present during the board's final deliberations, but the decision must be based only upon evidence which the prisoner has had the chance to defend against.

An integral part of the requirement that a decision be based solely upon evidence presented at the hearing is the additional necessity of a statement of the reasons for the decision and the evidence relied upon. Goldberg v. Kelly, *supra*, at 271. The record indicates that this procedure has not been regularly followed. More often than not, the Offense and Disciplinary Action Report reveals only the notation of "guilty" or "not guilty," and the punishment imposed. This practice invites arbitrariness by failing to demonstrate that the decision reached was actually based upon evidence the prisoner had an opportunity to refute. Without this assurance, the right to notice and hearing becomes meaningless. Although it would be desirable for a stenographic or other verbatim record to be made of disciplinary hearings, the court finds no constitutional necessity for such.

Although the right of confrontation and cross-examination is fundamental to due process, the court is of the opinion that the unique circumstances of prison society warrant the limitation of that right when an individual supplying information against the accused is another prisoner who might be exposed to harm if his identity were known. In such cases, whether to allow confrontation may rest within the Administration's discretion.[6] This limitation should be construed most narrowly, and if the identity of an accusing inmate is obvious to all, then confrontation should probably occur. The court does not consider this limitation a significant infringement upon a prisoner's right to due process, for seldom, if ever, as reflected by the evidence in this case, does disciplinary action occur solely as a result of information given by another inmate. Especially when discipline is severe, such as is the case when an inmate is administratively segregated for an indeterminate period, evidence is gathered from various sources, including prison

6. *Contra*, Clutchette v. Procunier, *supra*; Landman v. Royster, *supra*.

employees. And the confrontation and cross-examination of guards and other prison employees must be absolute so long as the prisoner interrogation explores relevant matters and remains within reasonable bounds of decorum.

It is quite possible that an inmate's rule violation will also constitute a criminal offense. When this occurs, prison officials may, in addition to bringing the inmate before the prison disciplinary committee, refer the matter to the District Attorney General for possible criminal prosecution. There thus results a serious dilemma for the prisoner, for in speaking in his own behalf before the disciplinary board, a tactic which may be his best available defense, he incurs the possible risk of self-incrimination in a future prosecution. Conversely, the prisoner's silence before the disciplinary board may significantly impair his prospects for a favorable decision since the disciplinary hearing need not contain certain procedural safeguards, such as presumption of innocence and proof of guilt beyond a reasonable doubt, which are applicable in normal criminal prosecutions.

The situation presented is one in which *Miranda* rights, including that of the right to counsel, arguably attach at the onset of prison disciplinary proceedings.[7] Realistically, however, a prisoner fully aware of his right to remain silent, his right to counsel, and the fact that anything he says at the disciplinary hearing can and will be used against him in a subsequent prosecution, has not escaped the dilemma surrounding his choice of whether to speak to the disciplinary board, but has merely been made aware that it exists. A more fundamental question may be whether a prisoner in these circumstances can, con-

sistent with the privilege against self-incrimination, be required to make this choice at all. It may well be that the coercive nature of the situation vitiates the voluntariness of a prisoner's decision to speak to an extent which would prohibit use in subsequent criminal proceedings of any statements he makes to a disciplinary committee.[8]

■ Other than to point out that these problems exist, in the posture of this case the court does not reach either the question of whether prisoners charged with disciplinary offenses also punishable as crimes must be afforded counsel during prison proceedings, or the question of to what extent the Fifth Amendment forbids subsequent use in a criminal prosecution of statements made by a prisoner in his own behalf before a prison disciplinary tribunal. The court will only say that in disciplinary proceedings of this nature, prison officials should inform the prisoner of his right to remain silent, and that anything he says may be used as evidence against him in a subsequent criminal prosecution arising out of the same offense.

It is not clear from the record whether there exists any well-defined disciplinary appellate procedure within the defendants' institutions. Appellate review of some nature does exist, however, as is reflected by the fact that Warden James Rose reversed the decisions of two disciplinary boards in a matter concerning Carl Clifford Crafton, and only after a third hearing did Crafton's punishment become final.

■ Although the court can find no authority to support a constitutionally protected right to appeal the decision of a prison disciplinary tribunal, it is clearly the law that if prison authorities provide for an appellate procedure, the

---

7. *Clutchette* held that counsel, not counsel-substitute, must be afforded a prisoner in this situation. *See generally*, Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

8. *See* Sands v. Wainwright, 357 F.Supp. 1062 (M.D.Fla., 1973), in which prisoners were

granted "use" immunity of statements made by them in disciplinary hearings involving offenses of this nature; Melson v. Sard, 131 U.S.App.D.C. 102, 402 F.2d 653 (1968). *See also*, Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

equal protection clause requires that all prisoners be treated alike. *See* Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); Clutchette v. Procunier, *supra.* So, if defendants desire to provide for a right to appeal, and the court fully endorses such a choice, the appellate procedure should be clearly defined and communicated to every prisoner who sustains an adverse decision at a disciplinary hearing.

## VI.

Plaintiffs are entitled to a declaratory judgment to the extent that the disciplinary procedures employed by defendants violate the due process clause of the Fourteenth Amendment by failing to require that decisions of the disciplinary board be based solely upon evidence adduced at the hearing, and that the board state in writing the reasons for its decision and the evidence relied upon, when the punishment imposed pursuant to a disciplinary hearing may result in grievous loss to the prisoner involved. In the terms of this opinion, punishment which may constitute such a grievous loss includes, but is not necessarily limited to, (a) confinement in punitive segregation; (b) confinement in administrative segregation; or (c) removal from a work release program. When such punishments may be imposed, injunctive relief shall be granted enjoining defendants from conducting any further disciplinary hearings which fail to provide the two procedures set forth above.

The court holds, however, that these procedures need apply prospectively only, and this case shall therefore affect only those cases asserting infringement of due process through the absence of such procedures in disciplinary hearings which occur after the date of this opinion. *See generally,* Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Tehan v. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

In *Linkletter,* the Supreme Court prescribed a three-factor analysis to determine whether a new decision should receive retroactive application. Those factors, recently reaffirmed in Adams v. Illinois, 405 U.S. 278, 280, 92 S.Ct. 916, 31 L.Ed.2d 202 (1972), call for the court to look to the purpose to be served by the new rule, the reliance placed upon prior doctrines, and the effect retrospective application would have on the administration of justice. Linkletter v. Walker, *supra,* at 636. It has since been observed that of these factors, the purpose of the new rule is the most important. Desist v. United States, 394 U.S. 244, 249, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971).

Assuming *arguendo* that these criteria apply with equal force to decisions involving prison disciplinary procedures as they do to criminal litigation, the court concludes that the circumstances of this case do not require the retrospective application of the new procedures required by this opinion. In analyzing the purpose of these procedures, i. e., a decision based solely upon evidence adduced at the hearing, and a statement of the reasons for the decision and the evidence relied upon, it seems clear that they relate at least indirectly to the integrity of the factfinding process. As stated in Williams v. United States, *supra:*

> "Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect." 401 U.S. at 653.

However, " . . . the question whether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree."

Johnson v. New Jersey, *supra*, at 728, 729. Furthermore,

"[t]he extent to which a condemned practice infects the integrity of the truth-determining process at trial is a 'question of probabilities.' 384 U.S. at 729, 86 S.Ct. 1772, 16 L.Ed.2d at 889. Such probabilities must in turn be weighed against the prior justified reliance upon the old standards and the impact of retroactivity upon the administration of justice." Stovall v. Denno, *supra*, at 298.

From the evidence presented in this case the court does not find that the absence of the procedures outlined above has been such a serious flaw in disciplinary hearings as to cast substantial doubt upon the reliability of the decisions rendered. Especially when weighed against the factors of justified reliance upon former practices and the impact of retroactivity upon the administration of prison discipline, the probability that lack of a formal requirement that the board's decision be reflected in a written statement and be based solely upon evidence presented at the hearing has infected the truth-finding process is not sufficient to justify applying these procedures retroactively. The court finds that other procedural safeguards in effect at least since September 6, 1972, provide adequate assurance that prisoners have received a fair determination of their guilt or innocence of rules violations. Although defendants have also not provided in their written procedures that disciplinary boards be composed so as to be impartial, the evidence supports a finding that this procedure has been followed, and consequently the question of retroactivity in this regard is not presented.

A different conclusion is reached when considering the procedural safeguards of the September 6, 1972, order as hereinbefore summarized. The court considers those procedures, except for the right to the assistance of an inmate advisor at hearings, so inseparably a part of a fair hearing that the integrity of the truth-finding mechanism of disci-

plinary boards not affording these rights is so materially infected that retroactive application of these rights is needed. Excepted from this ruling is the right to counsel-substitute which, in applying the *Linkletter* tests, the court holds should apply prospectively from September 6, 1972.

■ Therefore, prisoners who were removed from work release or who are presently confined in segregation pursuant to disciplinary proceedings prior to September 6, 1972, in which they did not receive written notice of charges and a hearing at which they were permitted to be present and were afforded a reasonable opportunity to introduce evidence and to confront and cross-examine at least the accusing prison officials, are entitled to relief. Where such punishment has occurred, the affected inmate shall be reinstated to his prior status, if this has not already occurred, unless defendants within a reasonable time afford the inmate a hearing which comports with the requirements of due process as set forth in this opinion.

The court has previously found that Calvin Murry was removed from work release without any hearing whatsoever. Murry must therefore be returned to the work release program unless defendants schedule a hearing within a reasonable time to consider his alleged offense. The court feels that twenty (20) days from the date of this opinion constitutes a reasonable period in which to hold such a hearing.

Finally, defendants shall be required to submit to the court within thirty (30) days a plan for the conduct of disciplinary committee hearings which provides for the procedural safeguards set forth in this opinion as well as those of the September 6 order not otherwise discussed herein.

The court wishes to express its gratitude to Mr. Stephen C. Small of Nashville, Tennessee, who, at the court's request, served as counsel for Carl Clifford Crafton in this case. Mr. Small expended a great deal of time and effort

in this matter without compensation, and his representation of plaintiffs has, in every respect, been in the highest tradition of the legal profession.

This opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P. An appropriate order in accordance with this opinion shall be entered.

### ORDER

It is hereby ordered, adjudged and decreed, by consent of the parties, as demonstrated by their respective signatures below, that the application of disciplinary board procedures, Section 4.600 et seq. of the Manual of Adult Service Policies and Procedures for the Tennessee Department of Corrections, has failed to meet certain requirements of due process of law. To conform thereto, any prisoner accused of a rules violation shall have the following rights:

1. Written notice of the rule violated and the manner of its violation, no less than six hours prior to meeting a disciplinary committee.

2. The inmate at a disciplinary hearing must be confronted with the accusing witness and/or guard and provided an opportunity through his inmate-adviser, as provided in paragraph 4 hereafter, to respectfully interrogate the accuser relative to the accused's version of the alleged incident. One inmate witness may be called on behalf of the accused. Other inmate witnesses may appear at the discretion of the Board.

3. The accused inmate shall, in actual practice, be allowed to present "a defense of his position" as provided in Manual Section 4.600(5), both as to his version of the facts and as to any existing circumstances, which, in his opinion, tend to mitigate the severity of any punishment to be imposed.

4. The warden or supervisor of each correctional facility shall appoint five or more inmates to an Inmate Investigatory Board, from whose number, one board member shall be appointed to represent an inmate accused of a major rules violation. This appointed board member shall investigate the alleged incident, interview any inmate-witnesses, and meet the disciplinary committee along with the accused inmate. The member of the Inmate Investigatory Committee assigned shall have six hours written notice prior to a disciplinary committee hearing so that he may adequately investigate the alleged incident and assist the accused in presenting his position, both as to the facts of the alleged incident and any other circumstances tending to mitigate the punishment imposed.

It is ordered, adjudged and decreed that the defendants Mark H. Luttrell, Commissioner of Corrections, James H. Rose, Warden of the Tennessee State Prison, and Robert H. Moore, Supervisor of Brushy Mountain Prison, their agents, and all others acting in concert with them, are hereby permanently enjoined from placing any prisoner in administrative or punitive segregation in excess of sixty days for the violation of any prison rule. Any prisoner held in administrative or punitive segregation in excess of thirty days shall have his case reviewed no less than weekly so that he may present facts and circumstances tending to mitigate the sentence imposed. The defendants, their agents, and all others acting in concert with them are hereby permanently enjoined from the practice of allowing inmates to be placed in segregation for several days by a prison guard for investigation or upon suspicion of a rules violation without being given specific written notice of the charges, countersigned by the Operations Officer then on duty. No inmate may be retained in isolation for investigation or suspicion of rules violation longer than eighteen hours without this written charge being countersigned by the warden or acting deputy warden, certifying that, in his opinion, probable cause exists to suspect the charged inmate with said rules violation.

By consent of the parties, it is further ordered, adjudged and decreed that, within sixty days of the entry of this Order, the defendant Warden James H. Rose, will cause the Prison Good and Honor Time Restoration Committee to

review the record of the plaintiff, Carl C. Crafton, and restore all or such portions of the plaintiff's good and honor time as his record of conduct shall warrant. Reason for this Committee's action shall be set forth in writing.

It is further ordered, adjudged and decreed that the defendant James H. Rose will appear in this Court following review of plaintiff Carl C. Crafton's subsequent behavior in order to justify the decision as to the restoration of good and honor time.

This Court takes cognizance of the fact that uneven imposition of penalties upon inmates who seek to "present a defense of their position" may have a chilling effect upon the fundamental right to due process. Therefore, the Court will retain jurisdiction of this cause in order to determine that the severity of punishment subsequently imposed is in no way related to a respectful presentation of the inmate's position.

This Court will retain jurisdiction, and on short notice will entertain motions seeking enforcement of the injunction issued herewith.

This 6 day of September, 1972.