Edward R. CHILDS, Jr.,
Plaintiff-Appellant,

v.

Ernest PELLEGRIN, State Commissioner of Corrections; William Long, former State Commissioner of Corrections; Ron Bishop, Director of Programs; Dick Baumbach, Public Information Officer; Herman C. Davis, Warden, Fort Pillow State Farm; Kay Bradshaw; Davis Mills; Ross Bates; Marvin Smith; Bill Howell; Charles Cubine; Charles Piphus; Wayne Carpenter; Jim Rose, former Warden of Tennessee State Prison; Michael Dutton, Warden, Tennessee State Prison; James L. Vandever; Fort Pillow State Farm Tactical Squad; Lake County Regional Facility Tactical Squad, Defendants-Appellees.

No. 84–5605.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 1, 1986.

Decided June 24, 1987.

David Himmelreich, Atty. Gen., Nashville, Tenn., for Ernest Pellegrin.

Robert B. Littleton, Nashville, Tenn., for Ron Bishop and Dick Baumbach.

Patrick T. Nesbitt, Cincinnati, Ohio, for Edward R. Childs, Jr.

Bob Lynch, Jr., Nashville, Tenn., for Rose, Dutton and Vandever.

C. Hayes Cooney, Matthew J. Sweeney, III, Cyrus R. Booker, Nashville, Tenn., for Lake Co. Tactical and Ft. Pillow Tactical.

Before JONES and RYAN, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

RYAN, Circuit Judge.

Plaintiff Childs, a prisoner in the Tennessee State prison system, appeals the dismissal of his civil rights complaint under 42 U.S.C. § 1983. We reverse.

## I.

On July 11, 1983, Childs was a prisoner in the Fort Pillow State Prison in Tennessee, assigned to an outdoor work detail. He was standing in the prison yard when that work detail was ordered to report for duty. On this particular day, in keeping with an inmate-initiated work stoppage, no prisoners reported for duty when called. All the prisoners in the prison yard were herded to one corner of the yard and constrained with temporary fencing.

The work stoppage continued the next day, July 12, 1983. At one point on this second day, four of the inmates who were confined in the yard attempted to pass through an opening in the fencing while holding a white cloth over their heads. In response, guards opened fire with shotguns and all four inmates were wounded. Childs was standing nearby at the time but was not hit.

The following day, July 13, 1983, Childs was removed from the yard and transferred to the Tennessee State Prison. He was immediately placed in administrative segregation. The next day, Childs received an "involuntary administrative segregation placement report" signed by the prison warden, which stated that he was being placed in administrative segregation because he was believed to be the instigator of the sit-down strike at Fort Pillow. Childs signed this report.

On July 15, 1983, a three-member "discipline board" approved Childs' placement in segregation, due to the seriousness of the allegations against him. Childs later claimed that he "went before a disciplinary board" on July 15 and that at that time "they dismissed the charges against me." Childs' recollection conflicts with the written report.

Two weeks later, however, on July 27, 1983, a hearing was held before a three-member "administrative segregation review board." The written report does not reflect whether the charges against Childs were "dismissed" at this time. However, the board recommended that Childs be released into the general prison population. The warden rejected the board's recommendation pending completion of an investigation by "Internal Affairs."

One month later, on August 26, 1983, plaintiff again was reviewed by the administrative segregation review board. Child's request that he be allowed to remain in administrative segregation until he could be transferred to another institution was granted.

The next month, on September 21, 1983, Childs was again reviewed and again requested that he remain segregated until transferred. The report also states that Childs had been "cleared of being the instigator of the work stoppage." Childs remained segregated and continued to receive reviews approximately once a month until at least March 1984. Eventually, he was transferred to the Lake County Regional Prison, where he apparently remains at this time. The record does not disclose why Childs was not transferred from the Tennessee State Prison earlier.

On February 17, 1984, while still at the Tennessee State Prison, Childs filed a § 1983 complaint. This complaint was a form which Childs filled out in longhand, to which he attached several pages of additional detail. The complaint charged, among other things, that Childs had been forced to participate in the work stoppage, that he had been falsely accused of instigating the work stoppage, and that after

the allegations were dismissed on July 15, 1983, he was still held in administrative segregation and deprived of privileges such as work status and back pay. Childs also sought, and was granted, the right to proceed *in forma pauperis.*

In the complaint, and in a separate motion filed on March 26, 1984, Childs asked that counsel be appointed for him. This request was denied.

On April 17, 1984, Childs filed a "Supplemental Motion for Usage of Law Books, Materials, Typewriter, Etc." This motion alleged that Childs was being denied the use of law books, legal materials, pen, pencils, and paper. The motion also alleged that his requests for legal materials went unanswered for periods up to three weeks, and that he had been told by prison officials that inmates placed in segregation are "not permitted" access to such materials. This motion was not accompanied by a certificate of service, and apparently was never served on the defendants. One of the briefs filed in this court states that "at least some of the Defendants did not have notice of the claim." Apparently, no response to this motion was ever made. Childs never pursued the matter further, and the district court has not ruled on the motion.

The district court did, however, provide Childs an opportunity to appear at an evidentiary hearing on May 29, 1984. At the hearing, Childs testified regarding the events of July 1983, and following, upon which his complaint was based. The same day the district court dismissed the claim, for the reasons stated in a short memorandum opinion. Childs appeals from the order that accompanied that opinion.

## II.

Childs' allegation that he has been denied his right of access to the courts has two components: first, the failure to appoint counsel, and second, the failure to assure adequate access to legal materials.

Under 28 U.S.C. § 1915(d):

The court may request an attorney to represent any [litigant who is proceeding *in forma pauperis* ] unable to employ counsel and may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious.

As this statute makes clear, "the appointment of counsel in a civil case is, as is the privilege of proceeding *in forma pauperis,* a matter within the discretion of the court. It is a privilege and not a right." *United States v. Madden,* 352 F.2d 792, 793 (9th Cir.1965). The effect of the statute is to permit the court to pass on the sufficiency of the complaint in a preliminary way before appointing counsel. As this court has recently stated, appointment of counsel is not necessary when it is apparent that the appointment would be "a futile act." *Mars v. Hanberry,* 752 F.2d 254, 256 (6th Cir. 1985). "Appointment of counsel pursuant to 28 U.S.C. § 1915(d) is not appropriate when a *pro se* litigant's claims are frivolous ... or when the chances of success are extremely slim." *Id.* (citations omitted).

The second component of Childs' access to the courts claim has its basis in *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), where the Court stated:

[O]ur decisions have consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts. It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them.

*Id.* at 824–25, 97 S.Ct. at 1496. The Court went on to hold

that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.

*Id.* at 828, 97 S.Ct. at 1498 (footnote omitted). The Court reasoned:

Although it is essentially true, as petitioners argue, that a habeas corpus petition or civil rights complaint need only

set forth facts giving rise to the cause of action, but see, Fed.Rules Civ.Proc. 8(a)(1), (3), it hardly follows that a law library or other legal assistance is not essential to frame such documents. It would verge on incompetence for a lawyer to file an initial pleading without researching such issues as jurisdiction, venue, standing, exhaustion of remedies, proper parties plaintiff and defendant and types of relief available. Most importantly, of course, a lawyer must know what the law is in order to determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action.

*Id.* at 825, 97 S.Ct. at 1496–97 (footnote omitted).

In *Walker v. Mintzes,* 771 F.2d 920, 932 (6th Cir.1985), this court held that there is no "general constitutional right to some minimum amount of time in the prison law library." Rather, a prisoner's claim that he has been denied adequate use of the prison law library must be analyzed as a claim that he has been "denied access *to the courts.*" *Id.* (emphasis in original).

In this case, the trial judge has stated no reasons for his rejection of Childs' claim that he has been denied access to the courts; indeed, the court did not address the subject in its written opinion at all. Defendants contend that Childs' claim must be rejected because it is neither timely as an amendment to his complaint, *see* Fed.R. Civ.P. 15(a), nor a valid motion, because it was never served on the defendants. There is an obvious irony in these defenses, given the nature of Childs' request. The claim he makes is that he has been denied access to the materials that would permit him to learn what the rules of court required of him in order to conduct his case properly. It would be harsh, to say the least, to decline to consider this request because it was procedurally incorrect, and we decline to do so.

More to the point, there is no question that the trial court had the discretion *not to* appoint counsel. Presumably, this decision was made after reviewing the complaint and determining that it lacked merit. Re-gardless of the view this court may take of the merits of Childs' case, we cannot say that this determination was unreasonable.

Most importantly, defendants argue that Childs has not been denied access to the courts. His pleadings were poor and his research was minimal, but he did have the opportunity to go before the trial judge and be questioned quite carefully about the facts of his case. Undoubtedly, Childs might have testified more effectively if he had the assistance of counsel or the opportunity to do more extensive research. However, his claim was not dismissed because of a subtle jurisdictional defect or an easily remedied defect of pleading. The case was dismissed on the merits, because the trial judge concluded, after a hearing, that the pertinent portions of the complaint and the testimony in support of it did not suffice to state a claim under § 1983.

The hearing provided Childs with "meaningful access to the courts." *Bounds,* 430 U.S. at 824, 97 S.Ct. at 1496. Although the trial court did not act to provide counsel, or to check into the prison policies that were alleged to be impeding Childs' effort to vindicate his rights, the trial judge did give Childs his attention and the benefit of his own expertise at the hearing. At the same time, the trial court afforded Childs the opportunity to make a record for use on appeal. This procedure was appropriate under the circumstances and was not an abuse of discretion.

### III.

The substantive allegations in Childs' complaint all arose out of the July 1983 work stoppage. One set of concerns which found its way into the complaint had to do with the allegation by prison officials that Childs was the instigator of the work stoppage. The complaint alleged that this allegation was false, and that Childs had been harmed by the administrative actions taken against him in response to the false allegation. In particular, Childs complains of his transfer to the Tennessee State Prison, placement in administrative segregation, and consequent loss of prison employment and other advantages.

In the district court, then Chief Judge Morton disposed of these allegations by reference to two pertinent cases, *Grubbs v. Bradley,* 552 F.Supp. 1052 (M.D.Tenn. 1982), and *Crafton v. Luttrell,* 378 F.Supp. 521 (M.D.Tenn.1974). Both of these cases were class actions brought under § 1983 by prisoners in the Tennessee State Corrections System. In *Crafton,* Judge Morton held that certain prison disciplinary procedures violated the prisoners' right to due process of law. In *Grubbs,* Judge Morton held that certain prison conditions amounted to cruel and unusual punishment. Both opinions were accompanied by orders stating that the court would retain jurisdiction pending complete implementation of an adequate remedy.

Thus, Judge Morton considered all of Childs' claims that were in essence objections to prison conditions to be within the scope of *Grubbs.* Because Judge Morton retained jurisdiction in that case, Childs was a member of the class and these claims had already been litigated on his behalf. As for the claims centered upon the false allegations of instigating the work stoppage, and the consequent deprivation of privileges, Judge Morton determined that these allegations did not state a claim under *Crafton,* the due process case.

In *Crafton,* Judge Morton had written that administrative segregation "represents a measure which may be legitimately employed by state prison authorities in exercising their governmental function of preserving order and discipline within the prison system." 378 F.Supp. at 533. Because such segregation "constitutes a substantial loss of prisoner liberty," however, Judge Morton required that prisoners committed to segregation "shall be afforded rights consistent with the minimum requirements of due process." *Id.* at 533–534. The due process requirements established in *Crafton* and applicable to the administrative segregation procedure called for the prisoner to be provided written notice of charges against him within 18 hours of his segregation, an opportunity to prepare a defense, a weekly informal review of the prisoner's case, and a monthly hearing before a review board. At the

hearing held in this case, Judge Morton specifically questioned Childs to determine whether the consent decree in *Crafton* had been complied with in Childs' case.

In *Bills v. Henderson,* 631 F.2d 1287, 1298 (6th Cir.1980), this court held that the procedural rules established pursuant to *Crafton* "may no longer be mandated in view of" the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Furthermore, a more recent Supreme Court case, *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), is even more closely on point than *Wolff v. McDonnell.* It is *Hewitt,* decided in February of 1983, which supplies the most authoritative law on what process is due to a prisoner being placed in administrative segregation.

On January 15, 1985, we ordered that counsel be appointed for this appeal and that a transcript be provided to the prisoner at government expense. At the same time, we requested counsel to address the issue of whether the Tennessee Department of Corrections' regulations establish a liberty interest regarding administrative segregation under *Hewitt* and, if so, whether there are any genuine issues of material fact in this case.

### IV.

In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court construed written procedural guidelines applicable in the Pennsylvania State Prisons to create a "protected liberty interest" because the procedural guidelines "used language of an unmistakably mandatory character." *Id.* at 471, 103 S.Ct. at 871. All of the parties in this case agree that the Tennessee guidelines are indistinguishable from the Pennsylvania guidelines in their use of mandatory language, and that they must be construed under *Hewitt* to create a liberty interest.

The issue, therefore, is whether Childs has been shown to have received the process due him under the fourteenth amendment. The Supreme Court in *Hewitt* considered the process due to a prisoner being

placed in administrative segregation to be fairly minimal, but defined the indicia of due process in this area somewhat differently than previous cases, such as *Bills v. Henderson,* 631 F.2d 1287 (6th Cir.1980), and *Crafton v. Luttrell,* 378 F.Supp. 521 (M.D.Tenn.1974), had done:

> We think an informal, nonadversary evidentiary review is sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.[8]

> [8] The proceeding must occur within a reasonable time following an inmate's transfer, taking into account the relatively insubstantial private interest at stake and the traditionally board discretion of prison officials.

*Hewitt,* 459 U.S. at 476, 103 S.Ct. at 874.

The record clearly shows that Childs received notice of the charges against him. His signature appears on the "involuntary administrative segregation placement report" that was prepared on July 14, 1983. This report gave Childs notice of the allegation that he had instigated the work stoppage.

The record also shows clearly that Childs was given an opportunity to present his views orally to prison officials within a reasonable time after his placement in segregation. Although there is no written statement by Childs in the record, and while the record does not reveal whether he was given an opportunity to present his story at the time of his initial placement,

the written report filed with respect to the July 27, 1983 hearing before the administrative segregation review board, just two weeks after the segregation action, includes a space labeled "Summary of information presented by inmate." In this space, there is a hand-written notation: "Resident requests transfer back to Ft. Pillow."

The opportunity provided at this hearing may have been quite limited, and it may be that, for one reason or another, Childs did not at that time feel free to present all of the merits of his claim of entitlement to retransfer. Therefore, it could be said that this hearing was constitutionally deficient, even under the minimal standards set forth in *Hewitt,* in that it may not have been the sort of "evidentiary review" there contemplated.

Because the trial court considered matters outside the pleadings in weighing defendant's motion to dismiss, that motion must be "treated as one for summary judgment." Fed.R.Civ.P. 12(b):

> The District Court may grant a motion for summary judgment only if it finds from the whole record before it that there are no material facts which are in dispute. *See* Rule 56(c), Fed.R.Civ.Pro. It may not make findings of disputed facts on a motion for summary judgment. The movant has the burden of showing conclusively that there exists no genuine issue as to a material fact and the evidence together with all inferences to be drawn therefrom must be considered in the light most favorable to the party opposing the motion. The movant's papers are to be closely scrutinized while those of the opponent are to be viewed indulgently. *See Smith v. Hudson,* 600 F.2d 60, 63–64 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

*Watkins v. Northwestern Ohio Tractor Pullers Association,* 630 F.2d 1155, 1158 (6th Cir.1980). Childs contends that, in view of this rigorous standard, we must presume that he was given no "opportunity to present his views to the prison official charged with deciding whether to transfer

him to administrative segregation." *Hewitt*, 459 U.S. at 476, 103 S.Ct. at 874.

We decline to conclude, simply because of the thinness of this record, that there is a genuine issue about the material fact whether Childs was afforded the kind of hearing to which he was entitled. While the record could be construed to leave open the possibility that Childs received no meaningful opportunity to be heard on the merits with regard to his placement in segregation, we are not convinced that is a reasonable reading of the record. At the close of the hearing on July 27, 1983, the board recommended that Childs' request to be transferred back to Fort Pillow be approved. This recommendation was made despite the board's awareness that Childs had been placed in segregation as a result of serious charges of instigating a prison rebellion. This recommendation is compelling, if circumstantial, evidence that Childs had an opportunity to present the merits of his case, and that he did so effectively.

■ There is, however, an additional due process issue raised by this record which has not been resolved to our satisfaction. In his complaint, Childs alleged that: "Allegations against my person were dismissed on July 15, 1983, and TSP officials continued to hold me in Administrative Involuntary Segregation ..." The written reports from this period contradict Childs' assertion that he was cleared on July 15 of being the instigator of the work stoppage, but the reports do support the substance of his allegation, which is that he was held in segregation long after the justification for segregation had expired.

This allegation raises concerns that the parties have not addressed in their arguments to this court. There is little difference between depriving a person of liberty without due process of law, on the one hand, and failing to restore someone's liberty after any legal justification for its deprivation has been eliminated, on the other hand. That is why actions which affect the timing of a prisoner's release from prison, such as the deprivation of good time credit, are subject to scrutiny under the due process clause. *See Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).

Childs had several hearings before prison officials prior to the September 21, 1983 report that he had been cleared of the charges against him. Although the review board recommended on July 27, 1983, that Childs be retransferred, the prison warden determined that he should be held in segregation until an independent investigation of the work stoppage could be completed. It thus appears that Childs may have been held for two months simply so that the warden could be satisfied by independent evidence that Childs' claims of innocence were legitimate. Given the "relatively insubstantial private interest at stake and the traditionally broad discretion of prison officials," *Hewitt*, 459 U.S. at 476 n. 8, 103 S.Ct. at 874 n. 8, as well as the seriousness of the allegation that an inmate was the instigator of a violent prison uprising involving hundreds of prisoners, we do not consider the warden's two-month delay in clearing Childs to be unreasonable. Nor was the warden unjustified in retaining Childs in administrative segregation during this period.

We are troubled, however, by what happened next. Cleared of the charges which led to his transfer from Fort Pillow and his placement in segregation, Childs was kept in segregation for at least another six months. The only rationale that appears in the record for this extended detention was the warden's decision not to transfer Childs immediately upon his release from segregation. Because Childs was unwilling to rejoin the general population at the Tennessee State Prison, and because the warden declined to transfer him, Childs was kept in segregation month after month. "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974). It may well be, as the state has argued before this court, that the decision to transfer an inmate from one prison to another is generally left to the discretion of prison officials, and does not of itself give rise to due process protec-

tions. *See Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). The failure to retransfer the prisoner in this case, however, given that his segregation in the State Prison in the first place was a result of charges that were found to be groundless, suggests not so much an exercise of discretion as an arbitrary failure to restore the measure of liberty to which the prisoner was entitled.

We hold that a material issue of fact exists as to whether Childs was deprived of a constitutionally protected liberty interest arbitrarily by the failure of the warden of the Tennessee State Prison to transfer Childs to another institution once he had been cleared of the allegations which supported his initial placement in administrative segregation.

## V.

█ Childs also contends that he was deprived of a liberty interest protected by the due process clause of the fourteenth amendment when prison guards fired shotguns in his direction. On July 12, 1983, Childs was standing nearby when guards fired at four prisoners who were seeking to pass through an opening in the fence that restrained a large group of rebellious prisoners. Childs admits that, while four inmates were wounded, he was not hit by any of the shots.

Childs cites a single case in support of his argument that this incident violated his "right to personal security." *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), concerned the constitutional rights of a profoundly retarded inmate in a state institution for the mentally retarded. This inmate, who had the mental capacity of an 18-month-old child, "was injured on numerous occasions, both by his own violence and by the reactions of other residents to him." *Id.* at 310, 102 S.Ct. at 2455. The Court held:

> In the circumstances presented by this case, and on the basis of the record developed to date, we agree with his view and conclude that respondent's liberty interests require the State to provide minimally adequate or reasonable train-

ing to ensure safety and freedom from undue restraint.

*Id.* at 319, 102 S.Ct. at 2460. As for the standard to be applied in determining whether a violation of these rights had occurred, the Court held that "the Constitution only requires that the courts make certain that professional judgment was in fact exercised." *Id.* at 321, 102 S.Ct. at 2461. The Court expressly noted, however, that: "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321–22, 102 S.Ct. at 2461.

In contrast to the pathetic plight of the retarded inmate in *Youngberg,* Childs' allegation here borders on the absurd, especially considering that, as the Seventh Circuit has observed:

> The due process clause provides an elastic, flexible standard which varies with the attendant circumstances. "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961). In situations such as the present, where prison authorities are allegedly reacting to emergency situations in an effort to preserve the safety and integrity of the institution, the state's interest in decisive action clearly outweighs the inmates' interest in a prior procedural safeguard. "[T]he possibility of widespread violence is a continuous condition of prison life. A good faith determination that immediate action is necessary to forestall a riot outweighs the interest in accurate determination of individual culpability before taking precautionary steps." *United States ex rel. Miller v. Twomey, supra,* 479 F.2d [701] at 717 [ (7th Cir.1973) ].

*La Batt v. Twomey,* 513 F.2d 641, 645 (7th Cir.1975). In the somewhat comparable

context of allegations of excessive use of force by police officers, this court has recently stated:

> Some conduct by police officers ... may be of such a magnitude that it shocks the conscience of the court. *See Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). Intrusions of this type violate the due process clause of the Fourteenth Amendment, and hence are actionable under Section 1983. *Wilson v. Beebe,* 770 F.2d 578, 582–83, & 586–87 (6th Cir.1985) (en banc); *Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir.1980). In determining if a police officer's conduct rises to the level of a constitutional deprivation, factors such as the need for the force, the relationship between the need and the amount applied, the extent of the injury inflicted, and the motivation of the police officer in applying the force must be considered. *E.g., Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Finally, the circumstances surrounding the use of force must be carefully considered, *Shillingford* [*v. Holmes*], 634 F.2d [263] at 265 [(5th Cir.1981)]....

*Lewis v. Downs,* 774 F.2d 711, 713–14 (6th Cir.1985).

Finally, in *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), the Supreme Court held that a prisoner who was shot and seriously wounded by a guard could not recover on either an eighth amendment theory or a substantive due process theory in the absence of evidence suggesting "wantonness in the infliction of pain." 475 U.S. at ——, 106 S.Ct. at 1086, 89 L.Ed.2d at 262. Childs has not begun to make such a showing here. In light of the circumstances which led to the use of shotguns in this case, and in light of the fact that Childs was not struck and alleges no consequential injury, it cannot be said that his constitutional right to personal safety has been violated.

## VI.

We REVERSE the dismissal of Childs' § 1983 suit and REMAND to the district court for a determination of whether Childs' right to the due process of law was violated by his continued detention in administrative segregation after he had been cleared of the allegations which justified his initial placement in segregation.