**Bobby Joe RAINES**

v.

**Larry LACK, et al.**

**No. 3:86–0354.**

United States District Court,
M.D. Tennessee,
Nashville Division.

April 20, 1989.

Joe I. Majors, Ortale, Kelley, Herbert & Crawford, Nashville, Tenn., for Bobby Joe Raines.

Jane Young, Michael Lee Parsons, Asst. Atty. Gen., Nashville, Tenn., for defendants.

## MEMORANDUM

WISEMAN, Chief Judge.

At issue in this case is whether the plaintiff inmate, Mr. Bobby Joe Raines, was afforded due process when he was placed and retained in involuntary administrative segregation (IAS). Alleging violation of due process under 42 U.S.C. § 1983, plaintiff has sued Larry Lack, warden at the Turney Center Prison in Only, Tennessee, and Michael Dutton, warden at the Tennessee State Prison in Nashville, Tennessee. The matter is before the Court on cross motions for summary judgment. Plaintiff asserts that the record demonstrates that he received insufficient process under either *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (applicable to disciplinary proceedings) or *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (applicable to administrative proceedings). Defendants assert a qualified immunity defense. Alternatively, they argue that the process afforded plaintiff satisfies *Hewitt*, which properly applies in this case.

### Facts

Mr. Raines was originally placed in IAS in the wake of a riot at the Turney Center. The riot broke out on July 1, 1985, and was squelched the next day. The riot destroyed several prison buildings and caused extensive other damage. After the riot, the Turney Center remained in lockdown status until September. Mr. Raines was one of sixty inmates placed in segregation on or about July 12, 1985. Mr. Raines received a hearing before the prison's Discipline Board three days later. Defendant Lack was not present at the hearing. At the time of either his segregation or his hearing, Mr. Raines was notified in writing that he had been identified as one of the primary participants and instigators in-

volved in the July 1, 1985, riot.[1] After the hearing, the Board recommended plaintiff's release to the general population "due to no information being present at the hearing and inmate living in units which were not damaged." [2] After plaintiff was returned to his regular cell that day, defendant Lack overruled the Board's decision. Mr. Lack based his decision upon statements from two employees identifying plaintiff as an instigator.[3] Neither plaintiff nor the Board was aware of this evidence. Upon Lack's decision, plaintiff was returned to IAS on July 16, 1985. Three days later, on July 19, 1985, plaintiff received another hearing, which yielded the same finding as the first.[4] Again, defendant Lack overruled the Board's recommendation that plaintiff be returned to the general population. Plaintiff received a third hearing on July 22, 1985, resulting in the same recommendation. On July 23, 1985, defendant Lack disapproved, noting that plaintiff "has been identified as participating in the riot of July 1, 1985 and should continue to be held in segregation and the error in dating his disciplinary report should not be grounds for overriding the facts of his guilt." [5]

On the same day, defendant Lack transferred plaintiff and several other inmates to Tennessee State Prison.[6] On July 31, 1985, plaintiff received a hearing before Tennessee State Prison's Administrative Review Board, which recommended continued segregation "due to [the] write-up at Turney Center." [7] Defendant Dutton approved the recommendation. About one week later, on August 8, 1985, plaintiff was indicted by the Hickman County Grand Jury for his participation in the Turney Center riot. The State entered a *nolle*

*prosequi* on January 7, 1986, dropping the charges against plaintiff.

Between the times of the indictment and the dismissal, plaintiff received at least five hearings at the Tennessee State Prison. Each time the Board recommended that plaintiff remain in IAS pending resolution of the charges concerning the Turney Center riot, and the warden approved.[8] The Board also noted plaintiff's requests for transfer to another facility. Plaintiff's first review after dismissal of the charges took place on January 24, 1986. The Board recommended continued IAS until a transfer could be arranged; Dutton concurred. Shortly thereafter, while in IAS, plaintiff flooded his cell, and pled guilty to the offense in a disciplinary hearing. These events were not known to the Administrative Review Board on February 20, 1986, when it recommended that plaintiff be returned to the general population. Defendant Dutton overruled the Board's recommendation based on the cell flooding.[9] On March 7, 1986, plaintiff was informed of the basis for Dutton's decision and of the Board's concurrence upon learning of the flooding.[10] Plaintiff was released to the general population on March 21, 1986.[11]

## Analysis

The Court finds that *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), applies. Under *Hewitt,* plaintiff received the full measure of due process at Tennessee State Prison, but not at Turney Center. Nevertheless, the shortcoming at Turney Center did not violate a clearly established rule of law. Therefore, defendants' motion for summary judgment is granted as to defendant Dutton on the grounds that plaintiff received due process

1. Court Document No. 7 at p. 00061, Tennessee Department of Correction IAS Placement Report of 7/12/85.

2. *Id.*

3. Affidavit of Larry Lack at ¶ 9 (filed 2/16/88).

4. Court Document No. 7 at p. 00060, Placement Report of 7/19/85.

5. *Id.*

6. Lack Affidavit at ¶ 13.

7. Court Document No. 7 at 00059, Administrative Segregation Review Report.

8. *Id.* at 00030–48.

9. *Id.* at 00013.

10. *Id.* at 00005.

11. *Id.* at 00006.

and as to defendant Lack on the grounds of qualified immunity. On the other hand, in so far as he seeks injunctive relief against defendant Lack, plaintiff's motion for summary judgment is granted.

■ Tennessee inmates have a state-created liberty interest which entitles them to some degree of due process before being placed in administrative segregation. *Childs v. Pellegrin,* 822 F.2d 1382, 1386 (6th Cir.1987). *See also Franklin v. Aycock,* 795 F.2d 1253, 1260 (6th Cir.1986) (entitled to due process before placement in punitive segregation). This Circuit has recently recognized that *Hewitt,* 459 U.S. 460, 103 S.Ct. 864, "supplies the most authoritative law on what measure of process is due to a prisoner being placed in administrative segregation." *Childs,* 822 F.2d at 1386. According to *Hewitt,*

[A]n informal, nonadversary evidentiary review is sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into conduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily, a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then available evidence against the prisoner, the Due Process Clause is satisfied. This informal procedure permits a reasonably accurate assessment of probable cause to believe that misconduct occurred, and the "value [of additional 'formalities and safeguards'] would be too slight to justify holding, as a matter of constitutional principle" that they must be adopted.

459 U.S. at 476 & n. 8, 103 S.Ct. at 873 & n. 8.

Plaintiff argues that he was entitled to the more stringent standards contained in *Wolff v. McDonnell,* 418 U.S. 539, 560, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974). *Wolff* involved inmates faced with losing good-time credits and with disciplinary segregation. *See id.* at 546–47, 94 S.Ct. at 2969–70. *Wolff* held that under such circumstances, inmates must be given advance notice of the charges, the opportunity to present witnesses or documentation at an evidentiary hearing, a decision by an impartial tribunal and a written statement of reasons. *Wolff,* 418 U.S. at 564–67, 94 S.Ct. at 2978–80. *Accord Woodson v. Lack,* 865 F.2d 107, 109 (6th Cir.1989). The Sixth Circuit has held that inmates are entitled to the procedures in *Wolff* when they are segregated for punitive purposes "in response to a *determination of guilt* of a specific infraction of the rules." *Bills v. Henderson,* 631 F.2d 1287, 1296 (6th Cir. 1980) (emphasis added). *Accord Woodson,* 865 F.2d at 109–10.

Based upon a careful review of the entire record, however, the Court finds that *Hewitt* sets the measure of process due under these circumstances. First, this case presents facts remarkably similar to those in *Hewitt* and *Childs.* In *Hewitt,* prison officials segregated an inmate in the aftermath of a riot pending investigation of his role in the riot. The State subsequently filed criminal charges in state court, but eventually dropped them. *Hewitt,* 459 U.S. at 463–65, 103 S.Ct. at 867–68. *Childs* also involved a prisoner who was placed in IAS based upon allegations that he had participated in a prison disturbance. *Childs,* 822 F.2d at 1383–84. Similarly, the instant case involves placement in IAS and transfer to another institution based upon allegations that plaintiff instigated and/or participated in a prison riot, allegations which resulted in a criminal indictment against the plaintiff in state court. This case presents no factual basis for diverging from the *Hewitt–Childs* line of authority.[12]

12. This finding is consistent, though perhaps in tension, with the Sixth Circuit's decision in *Bills*

*v. Henderson,* 631 F.2d 1287 (6th Cir.1980), and *Woodson v. Lack,* 865 F.2d 107 (6th Cir.1989).

Second, the reasoning of both *Wolff* and *Hewitt* support the conclusion that the less formal procedures of *Hewitt* are appropriate here. The Court in *Wolff* declined to establish specific due process requirements which applied to a broad spectrum of circumstances. Rather, according to the Court, "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." 418 U.S. at 560, 94 S.Ct. at 2976. *Hewitt* reiterated this flexible approach. *Hewitt* balanced three factors identified in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976): private interests, governmental interests, and the value of additional procedural safeguards. 459 U.S. at 473–76, 103 S.Ct. at 872–74.

The private interest at stake is the state-created liberty interest in being free from IAS. This interest is not very weighty. Even where a radical change in the conditions or duration of confinement is at stake, confined inmates retain a more limited liberty interest than free citizens, parolees or probationers. *See Hewitt*, 459 U.S. at 467–70, 103 S.Ct. at 869–71; *Wolff*, 418 U.S. at 560–62, 94 S.Ct. at 2976–78. Plaintiff's complaint does not implicate such a radical change and is therefore even more limited than complaints involving, for example, revocation of parole, probation or good-time credits. *See Hewitt*, 459 U.S. at 470–75, 103 S.Ct. at 870–73. *Cf. Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (parole denial); *Wolff*, 418 U.S. 539, 94 S.Ct. at 2966 (good-time credit); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation). As in *Hewitt*, plaintiff "was merely transferred from an extremely restricted environ-

ment to an even more confined situation." *Hewitt*, 459 U.S. at 475, 103 S.Ct. at 873.

On the other hand, weighty governmental interests are at stake. Even under normal circumstances, the safe and efficient day-to-day operation of prisons is the paramount responsibility of prison administrators. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). Maintaining internal security is at the core of prison administrators' responsibilities, requiring decisions based upon both subjective evaluations and intuitive judgments. *See Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 464, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981). Thus, courts generally defer to the judgment of prison administrators on this core matter. *Hewitt*, 459 U.S. at 474, 103 S.Ct. at 872; *Bell v. Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878.

This responsibility weighs even more heavily than normal in the wake of an inmate uprising accompanied by extensive property damage. The actions of both Lack and Dutton against plaintiff were part of a broad effort to restore order to the Turney Center after a serious uprising and to prevent such occurrences in the future. Plaintiff's segregation and transfer appear to have been reasonable steps toward the necessary goals of restoring order, identifying both participants and instigators, and minimizing any lingering tensions. This administrative interest plainly outweighs any limited liberty interest of the plaintiff.

It is true, however, that regardless of the relative individual and governmental interests at stake, due process protects individuals against arbitrary governmental action. *See Wolff*, 418 U.S. at 558, 94 S.Ct. at 2975. Thus, given that plaintiff has a protected liberty interest, he is entitled to some measure of due process. The third factor un-

---

Unlike *Bills,* the record reveals not an actual "determination of guilt," but rather a determination of probable cause. Although *Woodson* affirmed the application of *Bills* to similar facts, it did so on the grounds that the lower court's finding that inmate Woodson was segregated for punitive purposes was not clearly erroneous. 865 F.2d at 109. Thus, *Woodson* does not bind

this Court to the lower court's findings. Indeed, Judge Higgins, whose decision was affirmed in *Woodson,* has since held that *Hewitt* applied to the segregation of an inmate which arose out of the very same disturbance at issue in this case. *See Hampton v. Lack,* No. 3:85–1082 (M.D. Tenn., filed 11/8/88).

der *Mathews v. Eldridge,* viz. the value of additional procedural safeguards, supports the conclusion that Hewitt sets the standard of process due under these circumstances. If the administrator has probable cause to believe that an inmate was involved in or instigated an uprising, then it is reasonable for him to surmise that the inmate presents a security risk and to take reasonable steps to mitigate that risk. The informal procedures in *Hewitt* permit a reasonably accurate assessment of probable cause. 459 U.S. at 476, 103 S.Ct. at 873.[13] The value of additional formalities and safeguards in guaranteeing the accuracy of this assessment is slight. *Id.* Indeed, the formal requirements of *Wolff* could frustrate the government's basic interest in preserving the integrity of the investigation into the uprising and insulating possible witnesses from coercion or harm.

■ In the opinion of this Court, the foregoing analysis compels the conclusion that *Hewitt* is the benchmark against which plaintiff's claims must be assessed. Under *Hewitt,* defendant Dutton accorded plaintiff all process to which he was due. Plaintiff received an informal review at Tennessee State Prison eight days after his transfer there. The records of the review show that the plaintiff was aware of the charges against him, that he had an opportunity to present his views to the review board, and that he received notice of the grounds for the board's decision to continue IAS, which was affirmed by defendant Dutton. Although this hearing involved no additional review of the evidence underlying the initial segregation, this does not render the hearing constitutionally deficient. *See Hewitt,* 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9. Plaintiff received periodic reviews thereafter, none of which presents constitutional problems. Although his first review after entry of the *nolle prosequi* on January 8, 1986, did not take place until January 24, 1986, this delay was reasonable under the circumstanc-

es. *Cf. Childs v. Pellegrin,* 822 F.2d at 1388. At the January 24 review, the Board recommended that plaintiff remain in IAS pending transfer to another institution, acknowledging the plaintiff's repeated requests for a transfer. The warden approved. On February 20, 1986, plaintiff received another review, at which time the Board recommended plaintiff's release to the general population. The warden overruled the recommendation on the grounds that the plaintiff, unbeknown to the Board, had pled guilty to flooding his cell. Once informed of the warden's decision and his reasons, the Board concurred. Plaintiff was notified of the reasons for the decision. Because these procedures satisfied the requirements of *Hewitt,* the motion for summary judgment on behalf of defendant Dutton is granted.

■ The process accorded plaintiff at Turney Center, on the other hand, was constitutionally deficient. A statement of reasons for an adverse decision against an inmate is an indispensable element of procedural due process. *Hewitt* requires not only that the inmate be informed of the reasons for the action against him, but also that he be given an opportunity to present his views. *Hewitt,* 459 U.S. at 477, 103 S.Ct. at 874. Although plaintiff received notice that his transfer to IAS was based upon his alleged participation in and instigation of the July 1 disturbance, neither he nor the disciplinary board had reason to know that the warden's decision had any factual basis. The record demonstrates that defendant Lack's failure to present the basis of his decision to either the board or the plaintiff effectively deprived the plaintiff of an opportunity to respond in a meaningful fashion to the charges against him. This falls short of the *Hewitt* requirements. Under these circumstances, defendant Lack must give some explanation for disagreeing with the Board which goes beyond a mere assertion of guilt.[14] Not only

---

**13.** The Court finds that the defendants had probable cause for believing that plaintiff presented a security risk. Although this assessment arises out of the belief that the plaintiff committed a serious rule infraction, there was

no actual "determination of guilt" which the Sixth Circuit has held triggers the *Wolff* procedures. *Bills,* 631 F.2d at 1296.

**14.** In this case, it would have been sufficient to offer a simple statement that the warden had

will such a requirement provide plaintiff with an opportunity to respond meaningfully to the adverse decision, but also it will provide some protection against arbitrary governmental action.

 Even though his actions deprived plaintiff of due process, defendant Lack is entitled to qualified immunity from plaintiff's claim for damages. Qualified immunity protects government officials from damage claims under 42 U.S.C. § 1983 unless the plaintiff demonstrates that defendant's actions violated a rule of law which was clearly established at the time of the violation. *See, e.g., Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038–40, 97 L.Ed.2d 523, 530–32 (1987); *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir.1988). This inquiry must focus upon the particular practice at issue. *See, e.g., Garvie,* 845 F.2d at 650. At the time plaintiff was placed in IAS and received a hearing before the Disciplinary Board, it was not clear that the defendant needed to provide anything more than a general statement of the charges. Nor was it clear that a more specific statement was required in the event the warden disagreed with the Board's recommendation. Therefore, defendant Lack is entitled to qualified immunity on plaintiff's damage claim.[15] Of course, qualified immunity does not attach to claims for injunctive relief. *See Pulliam v. Allen,* 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984). To the extent that plaintiff seeks to enjoin defendant Lack to comply with the requirements of due process as described in this memorandum, and to the extent that such relief has not previously been granted, plaintiff's motion for summary judgment is granted.

### Conclusion

For the reasons stated above, the motion for summary judgment on behalf of defendant Dutton is granted in all respects. The motion on behalf of defendant Lack is granted as to the issue of damages only. Plaintiff's motion for summary judgment is granted as to the request for injunctive relief against defendant Lack.

received confidential information placing the plaintiff at the scene of the riot or stating that plaintiff had been involved in an incident which played a role in the incitement of the riot. This would have provided some specific allegation to which plaintiff could have responded without compromising the safety of the informants. The specific requirements in other cases are likely to differ according to the circumstances.

**15.** Defendant should note, however, that future violations of this type will not enjoy the same immunity, whether committed by defendant Lack or others persons similarly situated. *Cf. White v. Pellegrin,* No. 3:85–0036, unpublished order (M.D.Tenn. 9/16/88), *adopting Report and Recommendation and Order of Magistrate (filed 8/27/85).*