19 F.3d 18
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jonah Louis GANT, Petitioner-Appellant,
v.
Billy COMPTON, Warden, Respondent-Appellee.
 No. 92-6341.
 United States Court of Appeals, Sixth Circuit.
 March 3, 1994.
 
 Before: MILBURN and NELSON, Circuit Judges; and GILMORE, District Judge.*
 PER CURIAM:
 
 
 1
 Petitioner Jonah Louis Gant filed this action under 28 U.S.C. 2254 seeking release from his confinement in administrative segregation (IAS) and expungement of certain institutional records. Since the filing of his petition, Gant has been released from IAS; however, he still seeks expungement of his institutional records relating to the IAS placement.
 
 
 2
 Petitioner Gant was placed in administrative segregation on January 14, 1987, based on his alleged role in a prison work stoppage which had occurred earlier that day.[1] Three days later, on January 17, 1987, Gant received an administrative hearing which, both parties agree, comported with the due process requirements set forth in Hewitt v. Helms, 459 U.S. 460 (1983). The parties likewise agree that the hearing petitioner Gant received did not comport with the due process protections afforded prisoners placed in disciplinary, as opposed to administrative, segregation. See Wolff v. McDonnell, 418 U.S. 539 (1974).
 
 
 3
 In his petition for a writ of habeas corpus, petitioner argued that, when prison authorities seek to confine an inmate in Involuntary Administrative Segregation (IAS) based on conduct that violates a specific disciplinary rule, the inmate must receive a hearing that comports with the due process requirements of Wolff. The district court disagreed. Although it agreed that respondent Compton's initial IAS report against petitioner could be read to allege a specific rule infraction (instigating a work stoppage), the court concluded that the decision to place Gant on IAS was out of concern for the future security of the prison rather than as punishment for instigating the work stoppage. Accordingly, the court denied habeas relief and dismissed the petition.
 
 
 4
 On appeal, petitioner argues that (1) the district court erred in finding that he was not entitled to a Wolff hearing prior to being placed on IAS, and (2) the district court erred in refusing to expunge his institutional records relating to the IAS placement. After a careful review of the entire record, we cannot say that the findings of the district court were clearly erroneous. Accordingly, we affirm the decision of the district court.
 
 I.
 
 5
 On the morning of January 14, 1987, as the inmates at Fort Pillow State Prison were assembling for work, the inmates on the "long line"[2] refused to go to work. The petitioner, Jonah Louis Gant, was an inmate at Ft. Pillow assigned to the yard crew. At the time of the work stoppage, he was at his work station in the prison yard adjacent to where the prisoners in the long line were assembling.
 
 
 6
 Wayne Douglas, Associate Warden for Security, asked petitioner Gant to address the striking inmates; however, he refused to do so.[3] Gant also refused Associate Warden Douglas' order to return to his cell.
 
 
 7
 Later that same day, Warden Billy Compton filed an involuntary administrative segregation (IAS) report against Mr. Gant. The report stated as follows:
 
 
 8
 Based upon reliable information received by [the Associate Warden for Security] on January 14, 1987, you were involved in the instigation of a work stoppage or strike. Based upon this information and in order to maintain this institution in a smooth well-run manner, involuntary administrative segregation is deemed appropriate.
 
 
 9
 Petitioner was placed temporarily in administrative segregation pending an IAS hearing, which was held on January 17, 1987. Before the proceeding began, Gant asked for a hearing before the Disciplinary Board because, in his view, Warden Compton's IAS report made a specific disciplinary charge. Over petitioner's objections, the IAS Board, rather than the Disciplinary Board, held the hearing. At the hearing, the IAS Board read the charges contained in Warden Compton's IAS report and heard testimony from Associate Warden Douglas. Douglas testified that confidential informants had stated that the strike was planned and that several confidential sources had identified Gant as one of the planners. Following Douglas' testimony, Gant was given an opportunity to respond. Gant denied any involvement in the work stoppage. At the conclusion of the hearing, the IAS Board agreed with Warden Compton's recommendation to place Mr. Gant in administrative segregation. The Board also recommended transferring Gant to another prison.
 
 
 10
 In accordance with the Board's recommendation, Mr. Gant was placed on IAS and arrangements were made for his transfer to Brushy Mountain State Prison. On January 26, 1987, shortly before his transfer to Brushy Mountain, Gant was found guilty of assaulting a Fort Pillow employee.[4] Upon his transfer to Brushy Mountain, Mr. Gant remained on IAS.
 
 
 11
 On July 14, 1987, Otis Jones, the warden at Brushy Mountain, filed an additional involuntary administrative segregation report which stated as follows:
 
 
 12
 Since [January] 1987, to date, inmate Gant ... has been involved in a work stoppage, written up for assault on an officer and refusing a direct order while at [Fort Pillow]. This behavior attitude of inmate Gant proceeded to make him a threat to the safe operations (sic) of the institution if he is released from [involuntary administrative segregation at this time].
 
 
 13
 Petitioner Gant remained on IAS during the entire time he was incarcerated at Brushy Mountain. In July 1987, he was transferred to the Tennessee State Prison (TSP), where he remained on IAS. While at TSP, Gant was offered a contract by prison officials calling for his release from IAS in return for his agreement to conduct himself in a certain manner. Gant refused to sign the contract, alleging that his initial segregation was illegal and that the contract was additional punishment. Gant remained on IAS until August of 1990, at which time he was released.
 
 
 14
 In his petition for a writ of habeas corpus, Gant alleges that he was denied due process at his initial IAS hearing at Fort Pillow. Gant argues that although his hearing before the IAS Board comported with the due process requirements under Hewitt v. Helms, supra, he was entitled to a disciplinary hearing that afforded him the full panoply of procedural protections outlined in Wolff v. McDonnell, supra. Specifically, petitioner argues that prison officials denied his request to confer with a jail-house lawyer, his request for witnesses to aid his defense, and his request for a continuance to allow him time to prepare his defense. Petitioner contends that he was entitled to a Wolff hearing because his placement on IAS stemmed from his alleged violation of the prison's disciplinary rule against work stoppages.
 
 
 15
 The district court dismissed petitioner's claims as either moot or frivolous. On appeal, this court remanded the case to the district court on the question of mootness. See Gant v. Dutton, 922 F.2d 841 (6th Cir.1991) (unpublished disposition). This court remanded the case because it believed there to be a factual issue of whether petitioner would have been placed in administrative segregation at Brushy Mountain if the disputed report at Fort Pillow had not been included in his prison record.
 
 
 16
 On remand, the district court, after an evidentiary hearing before the magistrate, determined that Gant would have remained on IAS at Brushy Mountain even if the disputed report at Fort Pillow had not been part of his disciplinary record. Although the Brushy Mountain IAS report cites petitioner's involvement in the work stoppage at Fort Pillow as one of the reasons supporting his continued placement on IAS, the warden at Brushy Mountain testified that, given petitioner's assault on a Fort Pillow prison employee shortly before his transfer, the warden would have recommended keeping Gant on IAS even if Gant had not been involved in instigating the work stoppage. The district court further concluded that Gant's initial IAS placement was due to security concerns at Fort Pillow, and that Gant was afforded all the process that was due him.
 
 II.
 
 17
 A liberty interest protected by the Fourteenth Amendment may arise from either the Due Process clause or the laws of the states. See Hewitt v. Helms, 459 U.S. 460, 466 (1983). Although the Due Process Clause does not create a liberty interest in being free from prison segregation, Tennessee prison regulations have been found to create a constitutionally protected liberty interest for inmates subject to either administrative or disciplinary segregation. Childs v. Pellegrin, 822 F.2d 1382 (6th Cir.1987), Franklin v. Aycock, 795 F.2d 1253 (6th Cir.1986), Bills v. Henderson, 631 F.2d 1287 (6th Cir.1980).
 
 
 18
 In Wolff v. McDonnell, supra, the Supreme Court held that inmates facing a loss of good-time credits arising from disciplinary charges for misconduct must be given advance notice of the charges, the opportunity for an evidentiary hearing, a decision by an impartial tribunal, and a written statement as to the evidence relied on and reasons for the disciplinary action. Wolff, 418 U.S. at 564-67, 94 S.Ct. at 2978-80.
 
 
 19
 In addition to previously outlined procedural protections, due process also requires an evidentiary basis for the prison official's decision. Superintendent, Massachusetts Correctional Inst. v. Hill, 472 U.S. 445, 455 (1985). When the decision regards disciplinary charges, the record must contain "some evidence" to support the decision. Id.
 
 
 20
 In contrast, when an inmate faces administrative segregation (based on the need to safeguard institutional security or during the pendency of an investigation into unresolved disciplinary charges), "[a]n inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." Hewitt v. Helms, 459 U.S. at 476.
 
 
 21
 Based on the foregoing, it is clear that the distinction between disciplinary and administrative segregation is critical because the former requires that an inmate be provided with greater procedural protections. It is likewise evident that merely labelling a segregation decision as "administrative" to avoid the due process requirements of Wolff is not permitted. See Woodson v. Lack, 865 F.2d 101 (6th Cir.1989). To tolerate such sophistry would be elevating form over substance and would enable prison administrators to circumvent the due process dictates of Wolff by a semantic sleight-of-hand. Thus, the critical question here is one of characterization, namely, whether Gant's IAS hearing was, in fact, a disciplinary hearing that would entitle him to all of the procedural due process protections afforded under Wolff and its progeny or whether it was an administrative hearing, triggering only the lesser procedural protections outlined in Hewitt.
 
 
 22
 Although Gant argues that he was placed in administrative segregation for punitive purposes, review of the transcript from the evidentiary hearing establishes that Gant was confined in administrative segregation in an effort to maintain security and control at Fort Pillow, rather than to punish him for any specific rule violation or infraction. The following facts support our decision in this regard: The warden's January 14, 1987, administrative segregation placement report states that Gant was recommended for administrative segregation in order to maintain the institution in a smooth well-run manner. At the February 19, 1992 evidentiary hearing before the magistrate, Warden Douglas testified that he recommended placing Gant on IAS out of a concern that the institution remain open and going and to prevent the recurrence of another work stoppage or possibly worse. Likewise, Corporal Greer, the chairperson of the prison Disciplinary Board, testified that Gant was placed on IAS because prison officials at Fort Pillow were trying to prevent the same type of situation from recurring. Corporal Greer further testified that prison officials believed that they could minimize the risk of a recurrence if they took two or three of the main instigators out of the general prison population.
 
 
 23
 Although petitioner Gant suggests that this Court's decision in Woodson v. Lack, supra, is controlling here, we cannot agree. In Woodson, the district court found that "Woodson was placed in solitary confinement as a punitive measure ... for participation in a riot, a serious rule infraction." Id. at 109. Moreover, the court found that Woodson's "continued segregation was based upon a finding of a specific rule infraction and not based on general considerations." Id.
 
 
 24
 In the instant case, unlike Woodson, the district court adopted the magistrate's finding that the decision to place Gant on IAS "reflected more of an exercise of prison officials' subjective predictions about Gant's likely future conduct ... [rather than] a determination of wrongdoing in a specific instance." Reviewing the findings of the district court with appropriate deference, as we must, we cannot say that these findings were clearly erroneous. Accordingly, we affirm the decision of the district court denying Gant's petition for habeas corpus.
 
 
 25
 DAVID A. NELSON, Circuit Judge, concurring.
 
 
 26
 I concur in the court's judgment and in most of its opinion. The beginning of Part II of the opinion prompts me to write separately, however, because the bald statement that "[a] liberty interest protected by the Fourteenth Amendment may arise from ... the Due Process clause ..." requires a bit of clarification, in my view.
 
 
 27
 The statement in question accurately reflects a rather cryptic dictum in Hewitt v. Helms, 459 U.S. 460, 466 (1983). But Meachum v. Fano, 427 U.S. 215 (1976)--the authority that Hewitt cites in support of the dictum--does not say that a protected liberty interest may originate in the Due Process Clause itself. Meachum simply indicates that a liberty interest may originate "in the Constitution," see 427 U.S. at 226--and the Constitution, as amended by the Bill of Rights, is obviously broader than the Due Process Clause of the Fourteenth Amendment.
 
 
 28
 The Due Process Clause says that no state shall "deprive any person of life, liberty, or property, without due process of law." The clause assumes that life, liberty and property already exist; it does not, I think, presume to create them.
 
 
 29
 As to "life," the first of the trinity of interests protected by the Due Process Clause, no one imagines that life arises from any constitutional clause. (Nor is life bestowed by the government, for that matter; even Orwell's Big Brother was fraternal rather than paternal.) As to "liberty" and "property"--words that "must be given some meaning," as the Court observed in Board of Regents v. Roth, 408 U.S. 564, 572 (1972)--the interests that attain this constitutional status do so "by virtue of the fact that they have been initially recognized and protected by state law," Paul v. Davis, 424 U.S. 693, 710 (1976), or, if not so recognized, "because they are guaranteed in one of the provisions of the Bill of Rights which has been 'incorporated' into the Fourteenth Amendment." Id. n. 5.
 
 
 30
 The majority opinion in Paul v. Davis was written by Justice Rehnquist, as he then was. Justice Rehnquist also wrote the majority opinion in Hewitt v. Helms. Reading the two opinions together, I can only conclude that when Justice Rehnquist spoke in Hewitt of liberty interests that "arise from ... the Due Process Clause itself," he must have been referring to liberty interests that are guaranteed in one of the provisions of the Bill of Rights and "arise from" the Fourteenth Amendment derivatively, the Fourteenth Amendment having "incorporated" the strictures of the Bill of Rights and made them binding on the states. Thus understood, I obviously have no quarrel with the Hewitt dictum.
 
 
 
 *
 The Honorable Horace W. Gilmore, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Wayne Douglas, the Associate Warden for Security, later testified that Warden Compton took this action based on confidential information which identified Gant as one of the instigators of the work stoppage
 
 
 [2]
 Inmates on the "long line" were allowed to work outside the prison doing general labor such as cutting trees and picking up trash along the side of the highway
 
 
 [3]
 Petitioner Gant held the elected position of inmate council representative. As such, he would air the prisoners' grievances with members of the prison administration at monthly meetings
 
 
 [4]
 The parties agree that Gant received a Wolff hearing with regard to the assault charge